## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANTHONY J. HAMPTON,

      Plaintiff,

v.

BARCLAYS BANK DELAWARE, et al.,

      Defendants.

Case No. 18-4071-DDC-ADM

### MEMORANDUM AND ORDER

Pro se plaintiff[1] Anthony J. Hampton filed his Second Amended Complaint[2] (Doc. 141) on September 27, 2019. The Complaint asserts claims against eight defendants,[3] alleging violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681–1681x, the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692–1692p. Defendant Barclays Bank Delaware ("Barclays") has

---

[1]    Because plaintiff proceeds pro se, the court construes his pleadings liberally. *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and hold them to a less stringent standard than formal pleadings drafted by lawyers). But, under this standard, the court does not assume the role as plaintiff's advocate. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). The court does not construct arguments for plaintiff or search the record. *Id.*

[2]    For brevity, the court refers to this Second Amended Complaint simply as "the Complaint" in this Order.

[3]    The Complaint also references "Defendants Does 1-10 [who] are currently unknown to plaintiff." Doc. 141 at 6 (Second Am. Compl. ¶ 18). It adds that the "Complaint will be amended when facts are discovered regarding unknown parties." *Id.* It's unclear what claims plaintiff intended to assert against these unnamed defendants, and he never has alleged any facts about them. While a plaintiff initially may sue unknown defendants by naming them as "John Doe," that permission does not last forever. "The Federal Rules of Civil Procedure [do] not permit such actions against unnamed defendants following a suitable length of time for the plaintiff to identify the John Does." *Culp v. Williams*, 456 F. App'x 718, 720 (10th Cir. 2012). Plaintiff filed this lawsuit on July 13, 2018, yet he never has identified any of the Doe defendants, or alleged any facts capable of supporting a claim against them, whoever they are. The court thus dismisses all claims against the Doe defendants.

asserted a counterclaim against plaintiff for breach of contract, seeking collection of $5,629.33 in alleged loan debt. Doc. 157 at 3. This matter comes before the court on Barclays's Motion for Summary Judgment (Doc. 157), defendant Marketplace Loan Grantor Trust, Series 2016-LD1's ("Marketplace") Motion for Summary Judgment (Doc. 203), and plaintiff's Motion for Leave to File Sur-reply (Doc. 183). Plaintiff has filed Oppositions to both summary judgment motions (Docs. 176 & 206), and defendants have replied (Docs. 182 & 207). For reasons explained below, the court grants defendants' motions and denies plaintiff's motion.

## I.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also In re Aluminum Phosphide Antitrust Litig.*, 905 F. Supp. 1457, 1460 (D. Kan. 1995). When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is 'genuine' if 'the evidence allows a reasonable jury to resolve the issue either way.'" (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)), *overruled on other grounds by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012). "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Nahno-Lopez*, 625 F.3d at

1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated" there. *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

Finally, federal courts do not view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## II.   Pro Se Litigant's Lack of Compliance with the Summary Judgment Rules

In accordance with D. Kan. Rule 56.1(f), Barclays and Marketplace each sent plaintiff a "Notice to Pro Se Litigant Who Opposes a Summary Judgment Motion."  Docs. 159 & 205. These notices advised plaintiff that he "may not oppose summary judgment simply by relying upon the allegations in [his] complaint.  Rather, [he] must submit evidence, such as witness statements or documents, countering the facts asserted by the defendants and raising specific facts that support [his] claim." *Id.* at 2.  The notices advised plaintiff that if he did "not respond to the motion for summary judgment on time with affidavits and/or documents contradicting the material facts asserted by the defendants, the court may accept defendants' facts as true, in which event [plaintiff's] case may be dismissed and judgment entered in defendants' favor without a trial." *Id.*

Consistent with our local rules, defendants attached to their Notices the full texts of the rules governing summary judgment:  Fed. R. Civ. P. 56 and D. Kan. Rule 56.1.  Docs. 159-1 & 159-2; Doc. 205 at 4–8.  The text of Rule 56(c) describes the required procedure for both the moving and nonmoving party when supporting factual positions in summary judgment briefing. Doc. 159-1 at 2–3; Doc. 205 at 4 (providing the text of Fed. R. Civ. P. 56(c)).  It also explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion" or "(3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is

4

entitled to it." *Id.* at 3 (providing the text of Fed. R. Civ. P. 56(e)(2) & (3)).  Likewise, D. Kan. Rule 56.1(a) provides that "[a]ll material facts set forth in the statement of the movant will be deemed admitted for the purpose of summary judgment unless specifically controverted by the statement of the opposing party." Doc. 159-2 at 2; Doc. 105 at 7 (providing the text of D. Kan. Rule 56.1(a)).  To controvert facts in the fashion the rule demands, D. Kan. Rule 56.1(b)(1) requires the nonmoving party to number the facts and "refer with particularity to those portions of the record upon which the opposing party relies, and, if applicable, state the number of movant's fact that is disputed." *Id.* (providing the text of D. Kan. Rule 56.1(b)(1)).

In his various responses to defendants' summary judgment motions, plaintiff has failed to controvert any of the facts asserted by defendants in their Memoranda in Support of Summary Judgment, as the rules require.  Although courts must construe the substantive pleadings of pro se parties liberally, *see Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994), pro se litigants still must comply with the procedural rules or suffer the consequences of noncompliance.  *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (stating that "[t]his court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants" (citation and internal quotation marks omitted)).  This includes the court's local rules. *Green v. Dorrell*, 969 F.2d 915, 917 (10th Cir. 1992); *see also Elrod v. Walker*, No. 06-3115-SAC, 2011 WL 6372881, at *6 n.3 (D. Kan. Dec. 20, 2011) (explaining that, on summary judgment, "[a]lthough the Court affords some leeway to pro se parties, it cannot merely overlook Plaintiff's failure to state and oppose material facts in compliance with the local rules, and Plaintiff's failure to submit admissible evidence . . . .").

On summary judgment, the court has no duty to search the record for a litigant to find evidence supporting that litigant's summary judgment interests.  *See Cross v. The Home Depot*,

390 F.3d 1283, 1290 (10th Cir. 2004) (explaining that, on a motion for summary judgment, "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record,'" and the district court has no obligation "to comb the record in order to make [the plaintiff's] arguments for him'" (first quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978); then quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000)).

This same standard applies to cases involving pro se litigants. *See Handy v. City of Sheridan*, 636 F. App'x 728, 2016 WL 66170, at *13 n.15 (10th Cir. Jan. 6, 2016) (affirming summary judgment against a pro se plaintiff, explaining that the district court had no duty to review the record independently for evidence that might negate summary judgment, and concluding the district court did not err by failing to consider evidence that the pro se plaintiff attached to his Complaint but did not cite in his opposition to summary judgment (citing *Cross*, 390 F.3d at 1290)); *McKinzy v. I.R.S.*, 367 F. App'x 896, 897 (10th Cir. 2010) (affirming summary judgment against a pro se plaintiff who alleged generally that disputed issues of material fact precluded summary judgment but failed to identify any part of the record to support his claim because "'[j]udges are not like pigs, hunting for truffles buried in briefs.'" (quoting *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995))).

Here, because plaintiff has controverted none of defendants' facts, the court can consider those facts undisputed for purposes of summary judgment. The court also has reviewed the summary judgment record submitted by defendants and has determined that they support the statements of uncontroverted facts that follow.

III.    **Barclay's Motion for Summary Judgment (Doc. 157)**

   A.  **Statement of Uncontroverted Facts**

Barclays offers an invitation-only personal consumer loan product (the "Barclays Personal Loan").  Doc. 158-1 at 3 (Roark Decl. ¶ 4).  The Barclays Personal Loan is an unsecured installment loan product that offers consumers a loan ranging from $5,000 to $35,000. *Id.*  The Annual Percentage Rate (APR) for these loans ranges from 6.99% to 18.99% the loan repayment terms range from 36 months to 60 months.  *Id.*

*Barclays Approves Plaintiff for Personal Loan*

Plaintiff applied online for a Barclays Personal Loan.  Doc. 158-4 at 4–5 (Plaintiff Dep. 21:23–22:1).  As part of the online loan application process, plaintiff provided Barclays with his personal information and submitted photographs of his paystubs to verify his income.  *Id.* (Plaintiff Dep. 20:5–21:8, 22:9–13).  Plaintiff also provided Barclays with information about his bank account for depositing the loan's proceeds.  *Id.* at 5 (Plaintiff Dep. 22:23–25).  On October 18, 2017, plaintiff e-signed the online application.  *Id.* at 4–5 (Plaintiff Dep. 21:9–22:20); Doc. 158-1 at 4 (Roark Decl. ¶ 7).  Barclays approved him for a $5,000 loan with a 60-month term and a 9.99% interest rate.  Doc. 158-1 at 3–4 (Roark Decl. ¶¶ 5–7).  Barclays originated plaintiff's loan.  *Id.* at 5 (Roark Decl. ¶ 11).  As part of the online application process, plaintiff agreed to certain terms and conditions.  They included Barclays's "ESIGN CONSENT" providing that any communication Barclays sent him "may be in electronic form" and that Barclays could require electronic signatures from plaintiff.  *Id.* at 4–5 (Roark Decl. ¶¶ 7–8).

The terms of the Loan required plaintiff to make 60 monthly payments of $106.47 beginning November 24, 2017.  *Id.* at 4 (Roark Decl. ¶ 7).  Plaintiff agreed to the Loan's terms and conditions (the "Loan Agreement"), including repayment of the $5,000 principal amount,

plus interest.  Doc. 158-4 at 6 (Plaintiff Dep. 26:24–28:14).  The Loan Agreement provides that Barclays may recover "reasonable attorneys' fees, court, or other collection costs" in connection with the use of an attorney to collect on the Loan if plaintiff defaulted.  Doc. 158-1 at 4–5 (Roark Decl. ¶ 7).

### Plaintiff Used Loan Funds for Purchases and Made Monthly Payments to Barclays

On October 28, 2017, Barclays caused the $5,000 Loan proceeds to be deposited into plaintiff's checking account ending in 8508 with Kansas City Super Chief Credit Union—now Envista Credit Union—as plaintiff had requested.  Doc. 158-4 at 5, 9 (Plaintiff Dep. 24:1–25:4, 53:1–3).  Nobody besides plaintiff had authorization to access this bank account.  *Id.* at 5 (Plaintiff Dep. 24:17–19).  After receiving his $5,000 loan, plaintiff began spending the loan proceeds on various products and services, *e.g.*, online fantasy football websites.  *Id.* at 7–8 (Plaintiff Dep. 33:1–34:15).

Plaintiff made his first loan payment of $110.00 to Barclays around November 24, 2017.  Doc. 158-1 at 6 (Roark Decl. ¶ 2).  He made a second payment of $110.00 around December 24, 2017, and a third payment of $110.00 around January 25, 2018.  *Id.* (Roark Decl. ¶¶ 12–14).  The January payment was the last regularly scheduled monthly payment applied to plaintiff's Loan.  *Id.* (Roark Decl. ¶ 18).

### Plaintiff Defaults on Loan Obligations

Under the terms and conditions of the loan, plaintiff agreed that he would "be in default" if, in any month, Barclays did not receive his scheduled payment when due, or if he otherwise "fail[ed] to comply with th[e] Loan Agreement."  Doc. 158-1 at 4–6 (Roark Decl. ¶¶ 7, 19).  Plaintiff attempted to make a fourth payment around February 26, 2018, but the payment was returned because plaintiff's bank account contained insufficient funds.  Doc. 158-4 at 7 (Plaintiff

8

Dep. 31:5–22).  Then, plaintiff attempted to make another $110.00 payment on the loan around

March 24, 2018, but that payment was returned because the bank account contained insufficient

funds and he had closed the bank account.  Doc. 158-1 at 6 (Roark Decl. ¶ 16); Doc. 158-4

(Plaintiff Dep. 31:22–32:13).  After March 24, 2018, plaintiff never attempted to make any loan

payments.  Doc. 158-4 at 7 (Plaintiff Dep. 32:16–25).  Under the terms of the Loan Agreement,

plaintiff's failure to pay his loan payment timely was "an event of Default."  Doc. 158-1 at 4–6

(Roark Decl. ¶¶ 7, 19).

### Current Status of the Loan and Information About Barclays

The outstanding balance on the Loan—when Barclays filed its summary judgment

motion—was $5,629.33.  Doc. 158-1 at 6 (Roark Decl. ¶ 20).  "Barclays has not sold or assigned

any rights . . . to the Loan . . . ."  *Id.* (Roark Decl. ¶ 21).  It has not securitized the loan.  *Id.*  And

"Barclays owns the right to collection[ ] and future receivables on the Loan balance."  *Id.* at 6–7

(Roark Decl. ¶ 21).  Barclays isn't a "Consumer Reporting Agency," as that term is defined by

15 U.S.C. § 1681a(f) of the FCRA.  *Id.* at 29 (Roark Decl. ¶ 65).  Nor is it a "debt collector" as

defined 15 U.S.C. § 1692a(6) of the Fair Debt Collection Practices Act ("FDCPA") because

"Barclays has not used 'any instrumentality of interstate commerce or the mails in any business

the principal purpose of which is the collection of any debts, or who regularly collects or

attempts to collect . . . debts owed . . . ."  *Id.* (Roark Decl. ¶ 66).  "Barclays furnishes information

about its accounts according to the industry-standard Metro II Guidelines promulgated by the

Consumer Data Industry Association."  *Id.* at 30 (Roark Decl. ¶ 67).  Under these Metro II

Guidelines, furnishers like Barclays "may report a current account as in good standing."  *Id.*

(Roark Decl. ¶ 68).  "The Account Status Code '11' is appropriate when an account is in good

standing and currently paying as required."  *Id.*  "Code '71' is appropriate when an account is 30

days past due." *Id.* "Code '80' is appropriate when an account is 90 days past due." *Id.* Also, under Metro II Guidelines, furnishers "may report a specific amount of time that an account has been delinquent with an Account History code." *Id.* (Roark Decl. ¶ 69). "An account history code '1' is appropriate where an account is one month past due, [and] the code '2' is appropriate when an account is two months past due." *Id.* "In situations where the consumer disagrees with the investigation results, the Metro II Guidelines also provide that furnishers like Barclays may report a 'compliance condition code' of 'XC' to reflect that an FCRA investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 70).

### *Plaintiff's Disputes*

Beginning in April 2018, Barclays began receiving automated consumer dispute verifications ("ACDVs") from consumer reporting agencies ("CRAs") indicating that plaintiff disputed certain information on his credit report about the status of the Loan. *Id.* at 7 (Roark Decl. ¶ 22). Barclays received a total of 8 ACDVs, including more than 650 pages of documents, about plaintiff's account. *Id.* (Roark Decl. ¶ 23). These ACDVs included:

- ACDV from Trans Union on April 4, 2018 (the "April 4, 2018, Trans Union ACDV")

- ACDV from Experian on April 6, 2018 (the "April 6, 2018, Experian ACDV")

- ACDV from Equifax on April 6, 2018 (the "April 6, 2018, Equifax ACDV")

- ACDV from Trans Union on May 8, 2018 (the "May 8, 2018, Trans Union ACDV")

- ACDV from Trans Union on May 13, 2018 (the "May 13, 2018, Trans Union ACDV")

- ACDV from Experian on May 16, 2018 (the "May 16, 2018, Experian ACDV")

- ACDV from Equifax on May 16, 2018 (the "May 16, 2018, Equifax ACDV")

- ACDV from Equifax on May 17, 2018 (the "May 17, 2018, Equifax ACDV")

*Id.* at 7–8 (Roark Decl. ¶¶ 2, 3).

### *The April 4, 2018, Trans Union ACDV*

On April 4, 2018, Barclays received an ACDV from Trans Union.  Doc. 158-1 at 8 (Roark Decl. ¶ 24).  This ACDV listed "Dispute Code 1: 106:  Disputes present/previous Account Status/Payment Rating/Account History.  Verify Account Status, Payment Rating and Account History."  *Id.* (Roark Decl. ¶ 25).  The ACDV included 174 pages of images of the following:

a.  A letter dated March 20, 2018 addressed to the CEO of Trans Union (the "Barclays CRA Letter"):

> In the letter [plaintiff] alleges that the Loan "is NOT delinquent, because in order for it to be delinquent, there would first have had to be a legal and legitimate loan."  The letter alleges that a CRA must remove a derogatory debt if the information cannot be verified.  The letter continues that a debt "cannot be deemed 'accurate' if it cannot be 'verified'.  If it cannot be verified, then it is required to be removed according to the FCRA."  The letter also contains [plaintiff's] account number with Barclays, and is signed by [plaintiff].

*Id.* at 8–9 (Roark Decl. ¶ 26(a)).

b.  A letter dated March 21, 2018 addressed to James E. Staley/CEO of Barclays Bank Delaware (the "Staley Letter"):

> In the Staley Letter, plaintiff requests verification of the debt under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692.  This letter provides:

>> This Notice is to confirm that your claim is disputed under 15 USC § 1992 *et seq.* [the Fair Debt Collection Practices Act][*sic*].  Please verify under oath that this claim is valid, free from any claims and defenses including but not limited to:  any breach of agreement, failure of consideration or material alterations, and that the original lender provided value.  Further, that the alleged account was transferred in good faith and by the consent of all parties involved.

>> After reasonable inquiry I have concluded that BARCLAY'S BANK DELAWARE (hereinafter "BARCLAYS") is in breach of

the alleged agreement.  The following facts support my position in this matter:

> BARCLAYS failed to disclose to the alleged consumer Anthony J. Hampton (hereinafter "consumer") that BARCLAYS used consumer's note, capital, funds, money or money equivalent to fund a note, check or similar instrument that was used to fund the charges on the alleged account, whereby BARCLAYS did not perform under the agreement and risked nothing of value.  Full disclosures are required to validity [*sic*] any contract.
>
> BARCLAYS has not used any of their own capital, funds, money or money equivalents to pay for any charges on the alleged account.  I was very surprised to learn this fact.
>
> BARCLAYS received "something-for-nothing" by using the consumer's note(s) to fund charges to the loan account while retaining payments from consumer.
>
> When accounts are 90 days or more overdue, BARCLAYS receives a payoff of the amount due from insurance, whose premiums were unknowingly funded by the so-called "borrower".

*Id.* at 9 (Roark Decl. ¶ 26(b)).  The Staley Letter demanded that Barclays provide "[a]bsolute assurance" that Barclays did not breach plaintiff's Personal Loan Agreement. *Id.*  Finally, the Staley Letter demanded that the "recipient sign a purportedly enclosed affidavit, and provide him with additional information to 'verify' the debt, or delete and remove the debt from his 'credit file' report."  *Id.*  Plaintiff signed the Staley Letter, which included his Loan account number with Barclays.  *Id.*

c.  A copy of the Staley Letter, described in part (b) above, "but addressed to Tushar Morzaria/CFO, Barclays Bank Delaware" (the "Morzaria Letter").  *Id.* (Roark Decl. ¶ 26(c)).  "This letter included the 'VERIFICATION OF DEBT' affidavit that appeared to be missing from the Staley Letter."  *Id.*

d.  "A letter from [plaintiff] dated March 20, 2018, addressed to the CEO of Trans Union listing an alleged Loan Depot account number that was identical in all respects to the Barclays CRA Letter." *Id.* (Roark Decl. ¶ 26(d)).

e.  "A letter from [plaintiff] dated March 20, 2018 addressed to the Founder, Chairman, and CEO of Loan Depot that is substantively identical to the Staley Letter." *Id.* (Roark Decl. ¶ 26(e)).

f.   "A letter from plaintiff dated March 20, 2018 addressed to the Executive Vice President and CFO of Loan Depot that is substantively identical to the Mozaria Letter." *Id.* (Roark Decl. ¶ 26(f)).

g.  "A letter from [plaintiff] dated March 20, 2018 addressed to the CEO of Trans Union listing an alleged Sofi Lending Corp. account number that was identical in all respects to the Barclays CRA Letter." *Id.* at 11 (Roark Decl. ¶ 26(g)).

h.  "A letter from [plaintiff] dated March 20, 2018 addressed to the CEO of Sofi Inc. that was identical in all respects to the Staley Letter." *Id.* (Roark Decl. ¶ 26(h)).

i.  "A letter from [plaintiff] dated March 20, 2018 addressed to the General Counsel of Sofi Inc. that was identical in all respects to the Morzaria Letter." *Id.* (Roark Decl. ¶ 26(i)).

j.   "A letter from [plaintiff] dated March 20, 2018 addressed to the CEO of Trans Union listing an alleged Discover account number that was identical in all respects to the Barclays CRA Letter." *Id.* (Roark Decl. ¶ 26(j)).

k.  "A letter from [plaintiff] dated March 19, 2018 addressed to the CEO of Discover Financial Services that was identical in all respects to the Staley Letter." *Id.* (Roark Decl. ¶ 26(k)).

l.  "A letter from [plaintiff] dated March 19, 2018 addressed to the CFO of Discover Financial Services that was identical in all respects to the Morzaria Letter." *Id.* (Roark Decl. ¶ 26(l)).

m.  "A letter from [plaintiff] dated March 20, 2018 addressed to the CEO of Trans Union listing an alleged Prosper Marketplace account number that was identical in all respects to the Barclays CRA Letter." *Id.* (Roark Decl. ¶ 26(m)).

n.  "A letter from [plaintiff] dated March 21, 2018 addressed to 'David Kimball' of Prosper Marketplace that was identical in all respects to the Staley Letter." *Id.* at 12 (Roark Decl. ¶ 26(n)).

o.  "A letter from [plaintiff] dated March 21, 2018 addressed to the General Counsel of Proper Marketplace that was identical in all respects to the Morzaria Letter." *Id.* (Roark Decl. ¶ 26(o)).

p.  "A letter from [plaintiff] dated March 20, 2018 addressed to the CEO of Trans Union about Marketplace Loan Grantor Trust listing an alleged Loan Depot Account Number that was identical in all respects to the Barclays CRA Letter." *Id.* (Roark Decl. ¶ 26(p)).

q.  "A letter from [plaintiff] dated March 21, 2018 addressed to Marketplace Loan Grantor Trust listing an alleged Loan Depot account number purporting to be a notice of a disputed debt under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq*." *Id.* (Roark Decl. ¶ 26(q)).

r.  "A letter from [plaintiff] dated March 21, 2018 addressed to Marketplace Loan Grantor Trust listing an alleged Loan Depot account number purporting to be a notice of a disputed debt under the Fair Debt Collection Practices Act. 15 U.S.C. § 1692 *et seq*.  This letter also included a 'VERIFICATION OF DEBT' affidavit." *Id.* (Roark Decl. ¶ 26(r)).

14

Barclays investigated the April 4, 2018 Trans Union ACDV and the 174 pages of documents associated with it, described above. *Id.* (Roark Decl. ¶ 27). Barclays reviewed its business records about the Loan, plaintiff's dispute, and the documents requesting verification of his debt. *Id.* "Barclays also confirmed [plaintiff's] demographic information and confirmed that plaintiff had made a payment on February 24, 2018 that was returned due to insufficient funds . . . ." *Id.* And, it confirmed "that [plaintiff] made a payment on March 24, 2018 that was canceled and returned due to insufficient funds, and that no further payment had been made." *Id.*

"Barclays responded to the April 4, 2018, Trans Union ACDV on April 11, 2018, with 'Response Code: 22: Updated disputed account information. Additional account information also updated.'" *Id.* (Roark Decl. ¶ 28). Specifically, Barclays's update included the following information:

a.   Plaintiff's first name and middle name were updated from "Toni A." to "Anthony J." *Id.* (Roark Decl. ¶ 28(a)).

b.   "The Account Status was updated from Code 11 to 71 to reflect that the account was no longer in good standing and was 30 days past due." *Id.* (Roark Decl. ¶ 28(b)).

c.   Plaintiff's account balance "was updated from $4771 to $4902 and the Amount Past Due to $106." *Id.* (Roark Decl. ¶ 28(c)).

d.   "The 'Date of Account Information' was updated from March 25, 2018 to April 11, 2018, [and] the 'Date of Last Payment' was updated from March 25, 2018 to March 28, 2018." *Id.* (Roark Decl. ¶ 28(d)).

e.   "The 'FCRA DOFD [Date of First Delinquency]' was updated to March 24, 2018 and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA

15

investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 28(e)).

f.  Plaintiff's "Account History was also updated to reflect a one month delinquency as of March 2018." *Id.* at 14 (Roark Decl. ¶ 28(f)).

### The April 6, 2018, Experian ACDV

"On April 6, 2018, Barclays received an ACDV from Experian."  Doc. 158-1 at 14 (Roark Decl. ¶ 29).  This ACDV "listed 'Dispute Code 1:  112:  Consumer states inaccurate information Provide or confirm complete ID and verify all Account Information.'"  *Id.* (Roark Decl. ¶ 30).  Included with this ACDV "were 131 pages of images of the following":

a.  "Two letters dated March 20, 2018 addressed to the Chairman of Experian that were substantially identical to the Barclays CRA Letter attached to the April 4, 2018 Trans Union ACDV." *Id.* (Roark Decl. ¶ 31(a)).  These letters contained plaintiff's account number with Barclays, and plaintiff had signed one of the letters. *Id.*

b.  "A letter dated March 21, 2018 addressed to James E. Staley/CEO of Barclays Bank Delaware that was identical to the Staley [L]etter attached to the April 4, 2018 Trans Union ACDV." *Id.* (Roark Decl. ¶ 31(b)).  "The letter contained [plaintiff's] account number with Barclays, and was signed by [plaintiff]." *Id.*

c.  "A letter dated March 21, 2018 addressed to Tushar Morzaria of Barclays Bank Delaware that was identical to the Morzaria Letter attached to the April 4, 2018 Trans Union ACDV." *Id.* at 14–15 (Roark Decl. ¶ 31(c)).  "The letter contained plaintiff's account number with Barclays, and was signed by [plaintiff]." *Id.*

d.  Besides the letters addressed to and involving Barclays, "the April 6, 2018, Experian ACDV also included letters largely similar to those directed to the other co-

defendants and attached to the April 4, 2018, Trans Union ACDV." *Id.* at 15 (Roark Decl. ¶ 31(d)).

While investigating the April 6, 2018, Experian ACDV, Barclays personnel reviewed its business records about plaintiff's Loan, his dispute, and the 131 pages of documents he had supplied. *Id.* (Roark Decl. ¶ 32). Using separate databases, Barclays confirmed plaintiff's birth date, phone number, and address. *Id.* Also, Barclays confirmed plaintiff's account was past due. *Id.* Barclays responded to the dispute on April 11, 2018 with "Response Code 22: Updated disputed account information Additional account information was also updated." *Id.* (Roark Decl. ¶ 33). Barclays also provided the following updated information:

a. Plaintiff's birth date and telephone number were updated. *Id.* (Roark Decl. ¶ 33(a)).

b. Plaintiff's "Account Status was updated from Code 11 (Good Standing) to Code 71 (Account 30 days past due date)." *Id.* (Roark Decl. ¶ 33(b)).

c. Plaintiff's Loan balance was updated "from $4771 to $4902 and the Amount Past Due was updated to $106, the 'Actual Payment' was updated from $110 to $0." *Id.* at 16 (Roark Decl. ¶ 33(c)).

d. "The 'Date of Account Information' was updated from March 25, 2018 to April 11, 2018, and the 'Date of Last Payment' was updated from March 25, 2018 to March 28, 2018." *Id.* (Roark Decl. ¶ 33(d)).

e. "The 'FCRA DOFD' was updated to March 24, 2018, and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 33(e)).

f. "The Account History was updated to reflect a one month delinquency as of March 2018." *Id.* (Roark Decl. ¶ 33(f)).

17

### *The April 6, 2018, Equifax ACDV*

"On April 6, 2018, Barclays received an ACDV from Equifax."  Doc. 158-1 at 16 (Roark Decl. ¶ 34).  This ACDV "listed 'Dispute Code 1:  112:  Consumer states inaccurate information Provide or confirm complete ID and verify all Account Information.'"  *Id.* (Roark Decl. ¶ 35).  It also included 92 pages of images of the following documents:

    a.  "A letter dated March 20, 2018 addressed to the Chairman and CEO of Equifax that [w]as substantially identical to the Barclays CRA Letter attached to the April 4, 2018, Trans Union ACDV."  *Id.* (Roark Decl. ¶ 36(a)).

    b.  "A letter dated March 21, 2018 addressed to James E. Staley/CEO of Barclays Bank Delaware that was identical to the Staley Letter attached to the April 4, 2018, Trans Union ACDV."  *Id.* at 17 (Roark Decl. ¶ 36(b)).  The letter contained plaintiff's account number with Barclays, and plaintiff had signed the letter.  *Id.*

    c.  "A letter dated March 21, 2018 addressed to Tushar Morzaria of Barclays Bank Delaware that was identical to the Morzaria Letter attached to the April 4, 2018, Trans Union ACDV."  *Id.* (Roark Decl. ¶ 36(c)).

    d.  Besides the letters addressed to and involving Barclays, this ACDV "also included letters largely similar to those directed to the other co-defendants and attached to the April 4, 2018, Trans Union ACDV."  *Id.* (Roark Decl. ¶ 36(d)).

During its investigation of the Equifax ACDV dated April 16, 2018, Barclays reviewed its business records about plaintiff's account and his dispute, and the 92 pages of documents he had supplied.  *Id.* (Roark Decl. ¶ 37).  Barclays verified plaintiff's demographic information and confirmed his account was past due.  *Id.*  "Barclays responded to the dispute on April 16, 2018, with 'Response Code 22:  Updated disputed account information Additional account information

was also updated.'" *Id.* at 18 (Roark Decl. ¶ 38).  Specifically, Barclays updated the following information:

a. Plaintiff's telephone number was updated.  *Id.* (Roark Decl. ¶ 38(a)).

b. Plaintiff's loan balance was updated "from $4771 to $4908, the Amount Past Due was updated to $106 and the 'Actual Payment' was updated from $110 to $0." *Id.* (Roark Decl. ¶ 38(b)).

c. "The Account Status was updated from Code 11 (Good Standing) to 71 (Account 30 days past due date)." *Id.* (Roark Decl. ¶ 38(c)).

d.  "The 'Date of Account Information' was updated from March 1, 2018 to April 16, 2018, and the 'Date of Last Payment' was updated from March 1, 2018 to March 24, 2018." *Id.* (Roark Decl. ¶ 38(d)).

e. "The 'FCRA DOFD' was updated to March 24, 2018, and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 38(e)).

f. "The Account History was also updated to reflect a one month delinquency as of March 2018." *Id.* (Roark Decl. ¶ 38(f)).

### The May 8, 2018, Trans Union ACDV

"On May 8, 2018, Barclays received an ACDV from Trans Union."  Doc. 158-1 at 18 (Roark Decl. ¶ 39).  This ACDV "listed 'Dispute Code 1:  112:  Consumer states inaccurate information Provide or confirm complete ID and verify all Account Information.'"  *Id.* (Roark Decl. ¶ 40).  This ACDV included 79 pages of images, consisting of the following:

a. "A letter dated April 25, 2018 addressed to James E. Staley/CEO of Barclays Bank Delaware that was largely similar to the Staley Letter attached to the April 4, 2018,

Trans Union ACDV, but with several differences (the 'Second Staley Letter')."  This

letter provided:

> I have received two letters from your Delaware Post [O]ffice Boxes, 8833 & 8893 in response to my initial contact with your company regarding this particular matter.  Your organization continues to ignore my requests for confirmation.  Not that a loan was taken out in my name, but whether that 'loan' was even funded legally AND the failure of BARCLAYS not disclosing the fact that no money from their accounts fund any of your 'loans'.  **'Fraud vitiates the most solemn Contracts, documents and even judgments' U.S. v. Throckmorton, 98 US 61, at pg. 65**.  Therefore your institution's fraud nullifies any 'loan agreement' I may have signed.  The fraud I am writing of is the pretend loan agreement.  This 'money', along with the exorbitant interest, came from someones imagination and not from any genuine funds of BARCLAYS.  Clearly ILLEGAL!  Clearly FRAUD!

> Further, you did not answer any of the points in my letter of March 21, 2018.  I'm not even sure you received it or was made aware.  Nor did you sign the affidavit.  For these reasons, I am including them once again.  Prove under oath the 'loan' was funded legally from BARCLAYS accounts and that you all disclosed that information to me prior to the signing of the loan . . . .

> If you cannot verify this debt by the above listed means, then what right do you have, under the Fair Debt Collection Practices Act 15 USC§ 1692, to even send me a letter, or have a letter sent to me?  Are you committing mail fraud?

*Id.* at 19 (Roark Decl. ¶ 41(a)).

b. "A letter dated April 25, 2018 addressed to 'Tushar Morzario'/CFO of Barclays Bank

Delaware that was largely similar to the Morzaria Letter attached to the April 4, 2018,

Trans Union ACDV but with the same additional paragraphs quoted above."  *Id.* at 20

(Roark Decl. ¶ 41(b)).

c. "In addition to the letters addressed to and involving Barclays, the May 8, 2018,

Trans Union ACDV also included letters similar to those directed to other co-

defendants and attached to the April 4, 2018, Trans Union ACDV."  *Id.* (Roark Decl.

¶ 41(c)).

"In the course of investigating the May 8, 2018, Trans Union ACDV, Barclays personnel reviewed its business records relating to the Loan, [plaintiff's] dispute and the related 79 pages of documents."  *Id.* (Roark Decl. ¶ 42).  Barclays verified plaintiff's demographic information in separate databases and confirmed that his account accurately was reporting as past due.  *Id.* "Barclays responded to the dispute on May 21, 2018 with 'Response Code 22:  Updated disputed account information Additional account information was also updated.'"  *Id.* (Roark Decl. ¶ 43). It updated the following information:

a.  The balance on plaintiff's loan was updated "from $4921 to $4954, the 'Amount Past Due' was updated from $319 to $212 and the 'Actual Payment' was updated to $0.[4] *Id.* (Roark Decl. ¶ 43(a)).

b.  "The Account Status was updated to 80, reflecting the account was 90 days past the due date."  *Id.* (Roark Decl. ¶ 43(b)).

c.  "The 'Date of Account Information' was updated from April 25, 2018 to May 10, 2018, and the 'Date of Last Payment' was updated from March 25, 2018 to March 24, 2018."  *Id.* at 21 (Roark Decl. ¶ 43(c)).

d.  "The 'FCRA DOFD' was updated from February 22, 2018 to March 24, 2018 and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees."  *Id.* (Roark Decl. ¶ 43(d)).

e.  "The Account History was confirmed to reflect a two month delinquency as of April 2018."  *Id.* (Roark Decl. ¶ 43(e)).

---

[4]     It's not evident from the summary judgment facts why the "amount past due" decreased from $319 to $212 when plaintiff hadn't made any payments since January 2018.  But plaintiff doesn't dispute this fact, and it doesn't affect the court's analysis of defendant's summary judgment motion.

### *The May 13, 2018, Trans Union ACDV*

On May 13, 2018, Barclays received an ACDV from Trans Union.  Doc. 158-1 at 21 (Roark Decl. ¶ 44).  This ACDV "listed Dispute Code 1:  '039:  Insurance claim delayed Verify Account Status, Payment Rating, Amount Past Due, Current Balance and Account History' and[ ] Dispute Code 2:  103:  'Claims true identity fraud, account fraudulently opened Provide or confirm complete ID.'"  *Id.* (Roark Decl. ¶ 45).  Included with this ACDV were 84 pages of images consisting of the following:

a.  "A letter dated March 21, 2018 addressed to James E. Staley/CEO of Barclays Bank Delaware that was identical to the Second Staley Letter attached to the May 8, 2018, Trans Union ACDV."  *Id.* (Roark Decl. ¶ 46(a)).  "This letter contained [plaintiff's] account number with Barclays."  *Id.*

b.  "A letter dated April 25, 2018 addressed to Tushar Morzaria of Barclays Bank Delaware that was identical to the Second Morzaria Letter attached to the May 8, 2018, Trans Union ACDV."  *Id.* at 22 (Roark Decl. ¶ 46(b)).

c.  Letters similar to those directed to other defendants and attached to the April 4, 2018, Trans Union ACDV.  *Id.* (Roark Decl. ¶ 46(c)).

"In the course of investigating the May 13, 2018 Trans Union ACDV, Barclays personnel reviewed its business records" about the Loan and plaintiff's dispute, including the letter he had submitted with it.  *Id.* (Roark Decl. ¶ 47).  Barclays noted that plaintiff had sent the letter to its former CEO, "and that he had sent similar letters to Barclays' executives before requesting verification of his debt and that he had made multiple disputes regarding his liability on the Loan."  *Id.*  "Barclays personnel also reviewed plaintiff's Loan application and account agreement."  *Id.*  It verified plaintiff's name, phone number, and email address.  *Id.*

Because this ACDV provided that plaintiff had asserted identity theft, Barclays verified that plaintiff account was valid by confirming:  "(1) that the IP address on his loan application pinged to Topeka, Kansas," (2) "that [plaintiff's] income verification documents came from his actual employer," (3) "that all calls relating to his account came from the number on [plaintiff's] file," and (4) "that all voices on recordings of calls to Barclays" about the "account were the same." *Id.* at 22–23 (Roark Decl. ¶ 48).  "Barclays responded to the dispute on May 30, 2018 with 'Response Code 22:  Updated disputed account information Additional account information was also updated.'" *Id.* at 23 (Roark Decl. ¶ 49).  Specifically, Barclays updated the following:

a.  Plaintiff's first name and middle name were updated from "'Toni. A.' to 'Anthony J.'" *Id.* (Roark Decl. ¶ 49(a)).

b.  The balance on plaintiff's loan was updated "from $4921 to $4965 and the 'Actual Payment' was updated to $0." *Id.* (Roark Decl. ¶ 49(b)).

c.  "The Account Status was updated to 80, reflecting the account was 90 days past due." *Id.* (Roark Decl. ¶ 49(c)).

d.  "The 'Date of Account Information' was updated from April 25, 2018 to May 30, 2018, [and] the 'Date of Last Payment' was updated from March 25, 2018 to March 24, 2018." *Id.* (Roark Decl. ¶ 49(d)).

e.  "The 'FCRA DOFD' was updated from February 22, 2018 to March 25, 2018, and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 49(e)).

f.  "The Account History was updated to reflect a two month delinquency as of April 2018." *Id.* (Roark Decl. ¶ 49(f)).

### *The May 16, 2018, Experian ACDV*

"On May 16, 2018 Barclays received an ACDV from Experian."  Doc. 158-1 at 24
(Roark Decl. ¶ 50).  This ACDV "listed 'Dispute Code 1: 112:  Consumer states inaccurate
information Provide or confirm complete ID and verify all Account Information.'"  *Id.* (Roark
Decl. ¶ 51).  This ACDV included 82 pages of images consisting of the following:

   a.   "A letter dated April 25, 2018 addressed to James E. Staley/CEO of Barclays Bank
        Delaware that was identical to the Second Staley Letter attached to the May 8, 2018
        Trans Union ACDV.  The letter contained [plaintiff's] account number with
        Barclays."  *Id.* (Roark Decl. ¶ 52(a)).

   b.   "A letter dated April 25, 2018 addressed to Tushar Morzaria of Barclays Bank
        Delaware that was identical to the Second Morzaria Letter attached to the May 8,
        2018, Trans Union ACDV."  *Id.* (Roark Decl. ¶ 52(b)).

   c.   "In addition to the letters addressed to and involving Barclays, the May 13, 2018
        Trans Union ACDV also included letters largely similar to those directed to the other
        co-defendants and attached to the April 4, 2018, [ ] Trans Union ACDV."  *Id.* (Roark
        Decl. ¶ 52(c)).

While investigating the Experian ACDV of May 16, 2018, Barclays personnel reviewed
its records, including the letters plaintiff had submitted.  *Id.* at 25 (Roark Decl. ¶ 53).  Barclays
noted that "the letter was addressed to Barclays' CEO, and that [plaintiff] had sent similar letters
to Barclays' executives before requesting verification of his debt."  *Id.*  It reviewed plaintiff's
Loan application and agreement, and "confirmed that [plaintiff] had disputed his non-liability for
the account before."  *Id.*  Barclays verified plaintiff's demographic information.  *Id.*  It also
confirmed that his account was past due.  *Id.*  "Barclays responded to the dispute on May 30,

2018 with 'Response Code 22:  Updated disputed account information Additional account information was also updated.'"  *Id.* (Roark Decl. ¶ 54).  Specifically, Barclays updated the following:

    a.  Plaintiff's birth date and phone number.  *Id.* (Roark Decl. ¶ 54(a)).

    b.  Plaintiff's loan balance was updated "from $4921 to $4965."  *Id.* (Roark Decl. ¶ 54(b)).

    c.  "The Account Status was updated to 80, reflecting the account was 90 days past due." *Id.* (Roark Decl. ¶ 54(c)).

    d.  "The 'Date of Account Information' was updated from April 25, 2018 to May 30, 2018, and the 'Date of Last Payment' was updated to March 24, 2018."  *Id.* (Roark Decl. ¶ 54(d)).

    e.  "The 'FCRA DOFD' was updated to March 25, 2018 and the 'Compliance Condition Code' was updated to 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees."  *Id.* at 26 (Roark Decl. ¶ 54(e)).

    f.  "The Account History was also updated to reflect a two month delinquency as of April 2018."  *Id.* (Roark Decl. ¶ 54(f)).

### *The May 16, 2018, Equifax ACDV*

"On May 16, 2018 Barclays received an ACDV from Equifax."  Doc. 158-1 at 26 (Roark Decl. ¶ 55).  This ACDV "listed 'Dispute Code 103:  Claims true identity fraud, account fraudulently opened.  Provide of confirm complete ID.'"  *Id.* (Roark Decl. ¶ 56).  Included with the ACDV was an image of "[a] letter dated April 25, 2018 addressed to Tushar Morzaria of Barclays Bank Delaware that was identical to the Second Morzaria Letter attached to the May 8, 2018 Trans Union ACDV."  *Id.* (Roark Decl. ¶ 57(a)).  While investigating the Equifax ACDV

dated May 16, 2018, Barclays reviewed its business records about plaintiff's Loan and his

dispute. *Id.* (Roark Decl. ¶ 58). It noted that plaintiff had "made multiple disputes" about his

liability on the Loan and had requested "verification of the Loan." *Id.* Barclays personnel also

reviewed plaintiff's Loan application and account agreement. *Id.* It verified his name, phone

number, and email address in separate databases. *Id.* at 27 (Roark Decl. ¶ 58). "Barclays

responded to the dispute on May 30, 2018 with 'Response Code 23: Disputed information

accurate. Updated account information unrelated to the dispute.'" *Id.* (Roark Decl. ¶ 59).

Specifically, Barclays updated the following:

a.  Plaintiff's telephone number. *Id.* at 27 (Roark Decl. ¶ 59(a)).

b.  The balance of plaintiff's loan was updated "from $4908 to $4965 and the Amount
    Past Due from $106 to $319." *Id.* (Roark Decl. ¶ 59(b)).

c.  "The Account Status was updated to 80, reflecting the account was 90 days past the
    due date." *Id.* (Roark Decl. ¶ 59(c)).

d.  "The 'Date of Account Information' was updated from April 27, 2018 to May 30,
    2018, and the 'Date of Last Payment' was updated from March 1, 2018 to March 24,
    2018." *Id.* (Roark Decl. ¶ 59(d)).

e.  "The 'FCRA DOFD [Date of First Delinquency] field' was updated from March 1,
    2018 to March 25, 2018, and the 'Compliance Condition Code' was updated to 'XC'
    to reflect that the FCRA investigation was completed and that the consumer
    disagrees." *Id.* (Roark Decl. ¶ 59(e)).

f.  "The Account History was also updated to reflect a two month delinquency as of
    April 2018." *Id.* (Roark Decl. ¶ 59(f)).

### *The May 17, 2018, Equifax ACDV*

"On May 17, 2018 Barclays received an ACDV from Equifax." Doc. 158-1 at 28 (Roark Decl. ¶ 60). This ACDV "listed 'Dispute Code 1: 112: Consumer states inaccurate information Provide or confirm complete ID and verify all Account Information.'" *Id.* (Roark Decl. ¶ 61). This ACDV included six pages of images of a "letter addressed to and regarding Sofi Inc. that was largely similar to those directed to the other co-defendants and attached to the April 4, 2018 Trans Union ACDV." *Id.* (Roark Decl. ¶ 62(a)). While investigating this ACDV, Barclays reviewed its business records about plaintiff's Loan, his dispute, and the letter he attached requesting verification of his debt, noting that "he had done so before." *Id.* (Roark Decl. ¶ 63). Barclays confirmed plaintiff's demographic information and confirmed that plaintiff made payments on February 24, 2018 and March 24, 2018, both of which were returned because of insufficient funds in his account. *Id.* It confirmed that "no further payment had been made." *Id.*

"Barclays responded to the dispute on May 30, 2018 with 'Response Code 22: Updated disputed account information Additional account information was also updated.'" *Id.* (Roark Decl. ¶ 64). Specifically, Barclays updated the following information:

    a. Plaintiff's telephone number. *Id.* at 29 (Roark Decl. ¶ 64(a)).

    b. "The balance on [plaintiff's] loan was updated from $4908 to $4965 and the Amount Past Due was updated from $106 to $319." *Id.* (Roark Decl. ¶ 64(b)).

    c. "The Account Status was updated to 80, reflecting the account was 90 days past due." *Id.* (Roark Decl. ¶ 64(c)).

    d. "The 'Date of Account Information' was updated from April 14, 2018 to May 30, 2018, and the 'Date of Last Payment' was updated from March 1, 2018 to March 24, 2018." *Id.* (Roark Decl. ¶ 64(d)).

e. "The 'FCRA DOFD' was updated from March 1, 2018 to March 25, 2018, and the 'Compliance Condition Code' was updated from 'XC' to reflect that the FCRA investigation was completed and that the consumer disagrees." *Id.* (Roark Decl. ¶ 64(e)).

f. "The Account History was also updated to reflect a two month delinquency as of April 2018." *Id.* (Roark Decl. ¶ 64(f)).

### ***Plaintiff's Suit Against Barclays***

The Complaint asserts that Barclays violated § 1681s-2(b) of the FCRA. Doc. 141 at 13–16 (Second Am. Compl. ¶¶ 49–59). The Complaint alleges that Barclays failed to "report" accurate information about his Loan to CRAs, and that it failed to investigate after receiving notice of a dispute of information from CRAs. *Id.* Plaintiff seeks statutory damages of $1,000. *Id.* at 16 (Second Am. Compl. ¶ 58). He also seeks $5,000 in punitive damages. *Id.* at 24 (Second Am. Compl.); Doc. 158-4 at 10–11 (Pl. Dep. 61:13–62:13). He seeks no actual damages, however. Doc. 158-4 at 10 (Pl. Dep. 61:13–62:3). He also testified that he has not sustained any emotional distress because of his claim. *Id.* at 11 (Pl. Dep. 63:6–64:24).

### B.  Plaintiff's Affidavit

Although plaintiff fails to controvert any of the facts asserted in Barclays's Memorandum in Support of Motion for Summary Judgment, he nonetheless has supplied an affidavit supporting his Opposition. Doc. 176 at 10. In it, plaintiff testifies that he "served Barclays . . . with demands for verification of the debt." *Id.* (Pl. Aff. ¶ 3). He testifies he never "received a lawfully verified response" from Barclays. *Id.* (Pl. Aff. ¶ 4). Plaintiff also denies "receiving a written signed agreement," and denies "that the alleged debt is [his] debt." And, he testifies, if the debt is his debt, he "den[ies] that it is a valid debt." *Id.* (Pl. Aff. ¶¶ 5–6). If it is a

valid debt, he testifies that he "den[ies] the amount . . . ." *Id.* (Pl. Aff. ¶ 8).  Barclays asks the court to strike this affidavit.  Doc. 182 at 7–9.

When deciding "whether a material issue of fact exists, an affidavit may not be disregarded because it conflicts with the affiant's prior sworn statements." *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986) (quoting 10A Charles A. Wright, Arthur Miller, & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 473–74 (2d 1983)) (further citation omitted).  But a court "will disregard a contrary affidavit" when . . . it constitutes an attempt to create a sham fact issue." *Id.* (citations omitted).  When deciding whether an affidavit creates merely a sham fact issue, the pertinent factors include "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." *Id.* "[C]onclusory and self-serving affidavits are not sufficient" to create a genuine factual issue. *Hall*, 935 F.2d at 1111.

Here, the analysis is simpler because plaintiff's Opposition never relies on this affidavit.  But, to the extent plaintiff might contend that this affidavit creates a factual dispute, the court strikes the testimony in it.  Plaintiff had access to all the information in the record when Barclays deposed him.  And, his affidavit does not try to explain any confusion in earlier testimony.  The court thus disregards plaintiff's testimony in his affidavit denying "the alleged account is [his] debt," that he denies his debt is "valid," and that he "den[ies] the amount sued for."  Doc. 176 at 10.  These conclusory and self-serving statements are insufficient to create a genuine dispute of material fact. *See Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (concluding

"merely conclusory" affidavits providing no factual bases for the inferences asserted cannot preclude summary judgment).

### C.  Analysis

The court first addresses Barclays's Motion for Summary Judgment against plaintiff's FCRA claim.  Concluding that Barclays is entitled to summary judgment against this claim, the court turns to Barclays's breach of contract counterclaim against plaintiff.

### 1.  Barclays's Motion for Summary Judgment Against Plaintiff's FCRA Claim (Doc. 157).

The Complaint alleges an FCRA violation under 15 U.S.C. § 1681 (Count 3).  Doc. 141 at 13–16 (Second Am. Compl. ¶¶ 49–59).  "Congress enacted [the] FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."  *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).  Among other things, the FCRA imposes various obligations on "furnishers" who provide financial and credit information to CRAs.  *See Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 (1st Cir. 2010); 15 U.S.C. § 1681s-2.

If a furnisher's negligence violates the FCRA, a consumer can recover his actual damages.  *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1179 (10th Cir. 2013) (citing 15 U.S.C. § 1681o(a)).  The FCRA also permits a consumer to recover statutory and punitive damages if the violation was "willful."  15 U.S.C. § 1681n(a); *see also Llewellyn*, 711 F.3d at 1179 ("'Under § 1681n(a), however, the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1,000.'" (quoting *Birmingham v. Experian Info. Sols., Inc.*, 633 F.3d 1006, 1009 (10th Cir. 2011))).

Although the Complaint is unclear, the court construes it as alleging a violation of 15

U.S.C. § 1681s-2(b).[5]   Doc. 158 at 40 n.4.  This provision of the FCRA imposes certain

requirements on a furnisher of information "who has received notice of a dispute *from a*

*CRA . . . .*"  *Llewellyn*, 711 F.3d at 1178 (emphasis added).  This provision requires the furnisher

to:

> (1) investigate the disputed information; (2) review all relevant information
> provided by the CRA; (3) report the results of the investigation to the CRA; (4)
> report the results of the investigation to all other CRAs if the investigation reveals
> that the information is incomplete or inaccurate; and (5) modify, delete, or
> permanently block the reporting of the disputed information if it is determined to
> be inaccurate, incomplete, or unverifiable.

*Id.* at 1178–79 (quoting *Pinson v. Equifax Credit Info. Servs., Inc.*, 316 F. App'x 744, 750 (10th

Cir. 2009)); *see also* 15 U.S.C. § 1681s-2(b)(1)(A)–(E).  If a furnisher fails to comply with its

obligations under § 1681s-2(b), the FCRA authorizes a consumer to assert a private cause of

action.  *Chiang*, 595 F.3d at 36; *Tilley*, 603 F. Supp. 2d at 1322.

Barclays asserts that it is entitled to summary judgment for three independent reasons:

(1) Barclays "furnished accurate information" about plaintiff's Loan "in response to the disputes

received from CRAs," (2) "Barclays conducted separate objectively reasonable investigations in

responding to each dispute received from CRAs," and (3) Barclays never "willfully violate[d] the

FCRA," so there is no triable issue on punitive damages.  Doc. 158 at 41.  The court addresses

these arguments, in turn, below.

---

[5]     This interpretation makes sense because the FCRA's requirement in § 1681s-2(a) that a furnisher
provide accurate information to CRAs does not create a private cause of action for a consumer to assert
against a furnisher of credit information.  *See Chiang*, 595 F.3d at 35 (noting that only § 1681s-2(b), but
not § 1681s2(a), confers a private right of action); *see also Tilley v. Global Payments, Inc.*, 603 F. Supp.
2d 1314, 1322 (D. Kan. 2009) ("Significantly, Congress did not create a private right of action for
violations of § 1681s-2(a). These duties can only be enforced by governmental agencies and officials.").

### a.   The Undisputed Summary Judgment Facts Show that Barclays Responded to Disputes Received from CRAs with Accurate Account Information.

Section 1681-2(b) of the FCRA requires a furnisher to modify, delete, or permanently block the reporting of disputed information if it is determined to be inaccurate, incomplete, or cannot be verified.  15 U.S.C. § 1681s-2(b)(1)(E).  To prevail on a section 1681s-2(b) claim, a plaintiff must demonstrate "actual inaccuracies that a furnisher's objectively reasonable investigation would have been able to discover."  *Chiang*, 595 F.3d at 29–30.  In other words, no triable issue exists if the undisputed facts show that Barclays furnished accurate information to the CRAs about plaintiff's loan.  *See Llewellyn*, 711 F.3d at 1185–86 (considering whether defendant had adduced sufficient evidence that it had furnished accurate information to CRA to affirm district court's decision granting summary judgment).

Barclays asserts it provided accurate information to the CRAs about plaintiff's loan. Specifically, Barclays argues, the undisputed facts show that:  (1) plaintiff applied for and received a personal loan from Barclays, (2) plaintiff agreed to the terms and conditions of the Loan, (3) plaintiff received the Loan proceeds in the bank account into which he had asked Barclays to deposit the funds, and (4) plaintiff made only three payments before he stopped making payments and defaulted.  Doc. 158 at 43.  After defaulting, Barclays asserts, plaintiff "flooded" Barclays and the CRAs with eight disputes and 650 pages of documents.  *Id.*  But none of these disputes or documents, Barclays contends, "contradicted the simple fact that [plaintiff] was responsible for the Loan, and that he failed to make timely payments" under the Loan's terms.  *Id.*  So, Barclays argues, it deserves summary judgment because the evidence shows that it furnished accurate information to CRAs about plaintiff's Loan.  *Id.* at 42.

Plaintiff's Complaint alleges that Barclays inaccurately reported to the CRAs that he had an account balance, when it should have reported a zero balance.  Doc. 141 at 15 (Second Am. Compl. ¶ 54).  But plaintiff has adduced no evidence that Barclays furnished inaccurate information to the CRAs.  The summary judgment record shows that plaintiff applied for—and Barclays approved—a $5,000 personal Loan.  Doc. 158-4 at 4–5 (Pl. Dep. 21:23–22:1); Doc. 158-1 at 3–4 (Roark Decl. ¶¶ 5–7).  The summary judgment record also shows that plaintiff agreed to the Loan's terms and conditions, including repayment of the $5,000 principal amount, plus interest.  Doc. 158-4 at 6 (Pl. Dep. 26:24–28:14).  Finally, the summary judgment record shows, plaintiff made just three payments of $110 each.  *Id.* at 6–7 (Pl. Dep. 28:15–30:24); Doc. 158-1 at 6 (Roark Decl. ¶¶ 12–14, 18).  The outstanding balance on the Loan—at the time Barclays filed its motion—was $5,629.33.  Doc. 158-1 at 6 (Roark Decl. ¶ 20).

Plaintiff's Opposition asserts that he "properly demanded validation of the alleged debt" and that Barclays failed to respond to his demand.  Doc. 176 at 2.  But, as a matter of law, Barclays had no obligation to "verify" plaintiff's loan.  Plaintiff has not asserted an FDCPA claim against Barclays, nor could he.  Barclays is the original creditor for plaintiff's Loan.  Doc. 158-1 at 5 (Roark Decl. ¶ 11).  It thus cannot qualify as a "debt collector" under 15 U.S.C. § 1692a(6) of the FDCPA.  *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017) ("[T]hird party debt collection agents generally qualify as 'debt collectors' under the relevant statutory language, while those who seek to collect for themselves loans they originated generally do not."); *see also Ladouceur v. Wells Fargo*, 682 F. App'x 649, 652 (10th Cir. 2017) (noting that a debt collector for purposes of the FDCPA does not include the consumer's creditors).  Because Barclays is not a "debt collector" under the FDCPA, it has no obligation to "verify" plaintiff's debt.  15 U.S.C. § 1692g(b) ("If the consumer notifies the debt collector in

writing . . . that the debt . . . is disputed, . . . the debt collector shall cease collection of the debt . . . until the debt collector obtains verification of the debt . . . and a copy of such verification . . . is mailed to the consumer by the debt collector."); *see also Maynard v. Cannon*, 401 F. App'x 389, 396–97 (10th Cir. 2010) (discussing debt collectors' verification obligations under § 1692(g)).  Barclays's alleged failure to "verify" plaintiff's loan does not preclude the court from entering summary judgment against plaintiff's FCRA claim.

Plaintiff's Opposition also asserts that Barclays "has failed to prove that it owns any alleged account receivables" and "fail[ed] to show it is a holder in due course."  Doc. 176 at 2. The court disagrees.  Barclays has adduced evidence that it is the originator of plaintiff's Loan and that it "owns the right to collection and future receivables on the Loan balance."  Doc. 185-1 at 5, 6–7 (Roark Decl. ¶¶ 11, 21).  It's not clear what plaintiff means when he invokes the familiar term "holder in due course."  Doc. 176 at 2.  Under the Uniform Commercial Code, a "'holder in due course' means a holder who gave value, in good faith, and without notice that the instrument is overdue, contains any irregularities, has been dishonored, or is subject to defenses." *Fifth Third Bank v. Canyon Crest Ins. Servs., Inc.*, No. 09-2440-CM, 2013 WL 12250855, at *3 (D. Kan. Jan. 4, 2013) (citing U.C.C. § 3-302; and then citing Kan. Stat. Ann. § 84-3-302).  But that definition doesn't apply here because Barclays never purchased the Loan, nor has it sold or assigned the Loan.  Doc. 185-1 at 5–7 (Roark Decl. ¶¶ 11, 21).  This effort to invoke the holder in due course concept creates no triable issue whether Barclays has violated the FCRA.

Because plaintiff has adduced no evidence that Barclays furnished inaccurate information about plaintiff's Loan balance to CRAs, there is no triable issue whether Barclays violated the FCRA.  The court thus grants summary judgment against plaintiff's FCRA claim that Barclays violated its duty as a furnisher.  *See Nagim v. Equifax Info. Servs.*, 446 F. App'x 105, 107 (10th

Cir. 2011) (affirming district court's decision granting summary judgment because plaintiff failed to adduce evidence refuting defendants' evidence that plaintiff's credit reports were "accurate at all times and that they followed proper procedures in reinvestigating the information").

> **b. The Undisputed Summary Judgment Facts Show Barclays Conducted a Reasonable Investigation into Each of the Disputes Received from CRAs About Plaintiff's Account.**

Next, Barclays asserts it deserves summary judgment against plaintiff's FCRA claim for a second independent reason: the summary judgment record shows it conducted objectively reasonable investigations into each of plaintiff's disputes that Barclays received from CRAs. Doc. 158 at 47. So, Barclays contends, it is entitled to summary judgment against plaintiff's FCRA claim. The court agrees.

A furnisher's duty to investigate a dispute under the FCRA "arises only after a CRA notifies the furnisher of a dispute . . . ." *Willis v. Capital One Corp.*, 611 F. App'x 500, 502 (10th Cir. 2015); *see also Llewellyn*, 711 F.3d at 1178 (noting that § 1681s-2b of the FCRA imposes certain requirements on a furnisher of information "who has received notice of a dispute *from* a CRA" (emphasis added)). When a furnisher receives a dispute notice from a CRA, it must undertake a reasonable investigation of the dispute. *Maiteki v. Marten Transp. Ltd.*, 828 F.3d 1272, 1275 (10th Cir. 2016). The Tenth Circuit has defined a "'reasonable' investigation" as "'one that a reasonably prudent person would undertake under the circumstances.'" *Id.* (quoting *Seamans v. Temple Univ.*, 744 F.3d 853, 864 (3d Cir. 2014)).

Whether an investigation was reasonable under the FCRA "'turns on what relevant information was provided to a furnisher by the CRA giving notice of a dispute.'" *Id.* (quoting *Boggio*, 696 F.3d at 617; and then quoting *Chiang*, 595 F.3d at 38 ("'[A] more limited

investigation may be appropriate when CRAs provide the furnisher with vague or cursory information about a consumer's dispute.'")); *see also Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1160 (9th Cir. 2009) ("Congress could not have intended to place a burden on furnishers continually to reinvestigate a particular transaction, without any new information or other reason to doubt the result of the earlier investigation . . . ."). "'[T]he reasonableness of the investigation is to be determined by an objective standard,'" and "'[t]he burden of showing the investigation was unreasonable is on the plaintiff.'" *Maiteki*, 828 F.3d at 1275 (quoting *Chiang*, 595 F.3d at 37).

The Tenth Circuit has recognized that "'[w]hether a defendant's investigation is reasonable is a factual question normally reserved for trial[.]'" *Id.* (quoting *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)). But "summary judgment [also] is proper if the reasonableness of the defendant's procedures is beyond question." *Id.* (quoting *Westra*, 409 F.3d at 827). When appropriate circumstances are present, "circuit courts have affirmed summary judgments on § 1681s-2(b) claims . . . ." *Id.* (first citing *Chiang*, 595 F.3d at 38–39; then citing *Gorman*, 584 F.3d at 1161; and then citing *Westra*, 409 F.3d at 827); *see also id.* at 1276–77 (affirming summary judgment against FCRA claim because plaintiff had not carried his burden to show that a reasonable jury could conclude from the undisputed facts that defendant's investigation of the dispute was unreasonable).

Plaintiff has adduced no evidence supporting a triable issue whether Barclays failed to abide by the requirements § 1681s-2b imposes. For each dispute Barclays received from a CRA, it reviewed plaintiff's dispute, his Loan records, and the documents requesting verification of his debt. It reviewed each ACDV it received, the "Dispute Codes" listed, and the attached "supporting" images of documents. Barclays verified plaintiff's account information to ensure

the information in the ACDV matched Barclays's record of plaintiff's Loan.  After completing

each investigation, Barclays responded with accurate information to each CRA and updated the

"Compliance Condition Code" to "XC" to reflect that Barclays had completed its FCRA

investigation and that plaintiff disagreed with its conclusion.  When plaintiff claimed identity

fraud in the May 13, 2016, Trans Union ACDV and May 16, 2018, Equifax ACDV, Barclays

verified plaintiff's loan by confirming "(1) that the IP address on [plaintiff's] loan application

pinged to Topeka, Kansas" (2) "that [plaintiff's] income verification documents came from his

actual employer," (3) "that all calls relating to his account came from the number on [plaintiff's

file," and (4) "that all voices on recordings of calls to Barclays" about the account were the

same.  Doc. 158-4 at 22–23 (Roark Decl. ¶ 48).  Barclays asserts that its investigations were

"reasonable under the circumstances."  Doc. 158 at 49.  It contends that each investigation

confirmed that Barclays's records were consistent with the information it furnished to the CRAs,

and plaintiff's disputes never caused Barclays to doubt the accuracy of its records.  *Id.* at 50.

Plaintiff never disputes these facts or the reasonableness of Barclays's investigations into

his disputes.  As explained above, a "'reasonable' investigation is 'one that a reasonably prudent

person would undertake under the circumstances.'"  *Maiteki*, 828 F.3d at 1275 (quoting

*Seamans*, 744 F.3d at 864).  Whether an investigation was reasonable under the FCRA "'turns on

what relevant information was provided to a furnisher by the CRA giving notice of a dispute.'"

*Id.* (quoting *Boggio*, 696 F.3d at 617).  Here, Barclays investigated the information the CRAs

provided, and it updated and confirmed plaintiff's account information.  The summary judgment

facts establish that Barclays considered the available information when it responded to each

ACDV dispute. When plaintiff claimed identity fraud in two disputes, Barclays took additional

steps to investigate the validity of plaintiff's Loan.  Plaintiff has controverted none of the

evidence Barclays has adduced about the reasonableness of its investigations.  In short, plaintiff has not carried his burden to show that a reasonable factfinder could conclude that Barclays's investigations were unreasonable.  *Chiang*, 595 F.3d at 37 ("The burden of showing the investigation was unreasonable is on the plaintiff." (citations omitted)).  The court thus concludes Barclays's investigation into plaintiff's dispute was reasonable, which provides a second, independent ground for granting summary judgment against plaintiff's FCRA claim.

### c.  The Summary Judgment Facts Preclude a Recovery of Punitive Damages.

Next, plaintiff seeks $5,000 in punitive damages against Barclays.  Doc. 141 at 24 (Second Am. Compl.); Doc. 158-4 at 10–11 (Pl. Dep. 61:13–62:13).  The FCRA permits a consumer to recover statutory and punitive damages if the violation was "willful."  15 U.S.C. § 1681n(a); *see also Llewellyn*, 711 F.3d at 1179 ("'Under § 1681n(a), however, the consumer need not prove actual damages if the violation is willful, but may recover punitive damages and statutory damages ranging from $100 to $1,000.'" (quoting *Birmingham*, 633 F.3d at 1009)).  "A 'willful' violation is either an intentional violation or a violation committed by an agency in reckless disregard of its duties under the FCRA."  *Birmingham*, 633 F.3d at 1009 (citing *Safeco*, 551 U.S. at 57–58).

Barclays asserts that plaintiff's punitive damages claim fails as a matter of law because (1) plaintiff never pleaded that Barclays "willfully" violated the FCRA, and (2) even if plaintiff had pleaded a willful violation of the Act, plaintiff has adduced no evidence of intentional or reckless conduct violating the FCRA.  Doc. 158 at 50.  The court agrees with Barclays.  Plaintiff has adduced no evidence supporting a triable issue of an FCRA violation, much less an intentional or reckless one.  The court thus grants summary judgment against plaintiff's punitive

damages claim.  *See Birmingham*, 633 F.3d at 1012 (affirming summary judgment where plaintiff "pointed to no described practice that would be a reckless violation of the FCRA").

### 2. Barclays's Motion for Summary Judgment on its Breach of Contract Counterclaim.

In its Answer to plaintiff's Second Amended Complaint, Barclays asserted a Counterclaim against plaintiff for breach of contract or unjust enrichment.  Doc. 145 at 1 n.1 (Answer to Second Amended Complaint).  Barclays's Answer incorporated by reference the Counterclaim it had asserted in its Answer to plaintiff's First Amended Complaint.  This counterclaim seeks to collect the unpaid balance of plaintiff's loan.  Doc. 60 at 19.  Barclays asserts it is entitled to summary judgment in its favor on its Counterclaim.  Doc. 158 at 41.  It seeks to recover the unpaid balance on plaintiff's account—$5,629.33 at the time it filed its summary judgment motion—plus "reasonable attorneys' fees [and] court costs or other collection costs" plaintiff agreed to in his Loan Agreement.  Doc. 158 at 55 (citation and internal quotation marks omitted).

Plaintiff opposes Barclays's request.  His Opposition asserts that Barclays is not entitled to summary judgment because it did not file any Counterclaims in its Answer to his Second Amended Complaint.  Doc. 176 at 3.  Barclays disagrees.  Barclays asserts that it expressly stated in its Answer to plaintiff's Second Amended Complaint that it "<u>does not</u> withdraw" its Counterclaim and incorporates by reference its Counterclaim brought in its Answer to plaintiff's First Amended Complaint.  Doc. 182 at 10; Doc. 145 at 1 n.1 (Answer to Second Am. Compl.); Doc. 60 at 19–21 (Answer to First Am. Compl.).

The court agrees with Barclays.  Its Counterclaim still is pending.  Fed. R. Civ. P. 10(c) provides, "A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion."  And, in any event, a party does not waive or

abandon a counterclaim by not reasserting it in an amended answer.  *See, e.g.*, *Cairo Marine Serv., Inc. v. Homeland Ins. Co. of N.Y.*, No. 4:09CV1492 CDP, 2010 WL 4614693, at *1 (E.D. Mo. Nov. 4, 2010) (rejecting argument defendant abandoned its Counterclaim by failing to replead it); *Barnes v. Akal Sec., Inc.*, No. 04-1350-WEB, 2005 WL 3359717, at *1 n.2 (D. Kan. Dec. 9, 2005) (concluding that although amended answer did not restate Counterclaim, the claim remained valid because it never was dismissed); *Dunkin' Donuts, Inc. v. Romanias*, No. Civ.A.00-1886, 2002 WL 32955492, at *2 (W.D. Pa. May 29, 2002) (explaining that defendant's failure to reassert Counterclaim in amended answer is not fatal for two reasons:  (1) Fed. R. Civ. P. 13 requires merely that a counterclaim be set forth in a pleading, and (2) a counterclaim is independent of an answer's response to a complaint's allegations).  Concluding that Barclays's breach of contract Counterclaim remains pending, the court next considers whether the summary judgment record supports summary judgment in Barclays's favor.

To prevail on a breach of contract claim under Kansas law, Barclays must show:  (1) "the existence of a contract between the parties;" (2) "sufficient consideration to support the contract;" (3) Barclays's "performance or willingness to perform in compliance with the contract;" (4) plaintiff's "breach of the contract;" and (5) "damages to [Barclays] caused by the breach."  *Mid-Am Bldg. Supply, Inc. v. Schmidt Builders Supply, Inc.*, No. 11-4167-KGS, 2013 WL 1308980, at *3 (D. Kan. Mar. 29, 2013) (quoting Pattern Instructions Kansas 4th 124.01-A; and then quoting *Comm. Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973)).  The court considers each element, in turn, below.

### a.  A Valid Contract Exists Between the Parties

Plaintiff applied online for the Loan in October 2017.  He requested that Barclays deposit $5,000 into his personal bank account ending in 8508.  Barclays then approved him for a $5,000

loan with a 9.99% interest rate payable in 60 monthly payments.  Plaintiff agreed to the terms and conditions on the loan.  On October 28, 2017, Barclays caused the $5,000 Loan amount to be deposited into plaintiff's checking account ending in 8508, as plaintiff had requested.  Barclays asserts that this conduct established the offer and acceptance required to form a valid contract.

The court agrees.  "[T]o form a binding contract, there must be meeting of the minds as to all the essential terms . . . ."  *Phillips & Easton Supply Co. v. Eleanor Int'l, Inc.*, 512 P.2d 379, 383 (Kan. 1973).  The summary judgment record shows that plaintiff—by agreeing to the Loan's terms and conditions—accepted Barclays's loan offer, forming a valid contract.  *See Lindsey Masonry Co. v. Murray & Sons Constr. Co.*, 390 P.3d 56, 61 (Kan. Ct. App. 2017) (noting that parties may be bound by the terms of the contract where they indicate their assent to the contract's terms); *Unified Sch. Dist. No. 446, Independence, Kan. v. Sandoval*, 286 P.3d 542, 547 (Kan. 2012) (explaining that valid contract requires "unconditional and unequivocal" acceptance of the exact terms of an offer (citation omitted)); *Steele v. Harrison*, 552 P.2d 957, 962 (Kan. 1976) ("It is fundamental that a communicated offer creates a power to accept the offer that is made . . . .").

### b.    Sufficient Consideration Existed to Support the Contract

Next, the court considers whether sufficient consideration existed to support the contract.  "It is a longstanding rule of law that for a contract to be enforceable it must be supported by consideration."  *Mitchell v. Miller*, 8 P.3d 26, 31 (Kan. Ct. App. 2000) (citation omitted).  "'The consideration necessary to establish a valid contract . . . must be an act, forbearance, or a return promise, bargained for and given in exchange for the promise.'"  *James Colborn Revocable Tr. v. Hummon Corp.*, 408 P.3d 987, 991 (Kan Ct. App. 2017) (quoting 17A Am. Jur. 2d *Contracts* § 113).  Consideration supported the parties' bargain here because Barclays loaned plaintiff

money in exchange for a promise to repay the loan, with interest. *See Tang v. Bank of Blue Valley*, No. 109,007, 2014 WL 702404, at *3–4 (Kan. Ct. App. Feb. 21, 2014) (noting that benefit conferred on the promisor suffices as consideration so long as the promisor would not have received that benefit but for the contract).

### c.   Barclays Performed its Contractual Obligations

Barclays asserts that it performed its contractual obligations by (1) providing plaintiff with $5,000 by causing that amount to be deposited into plaintiff's bank account, and (2) accepting plaintiff's payments and applying them to his Loan balance. Doc. 158 at 54. The court agrees. Barclays performed its contractual obligations.

### d.   Plaintiff Breached the Loan Contract

Under the terms of the loan contract, plaintiff agreed to make 60 monthly payments at a 9.99% annual interest rate to repay the balance of the Loan. Plaintiff made the first three payments in November 2017, December 2017, and January 2018. He also tried to make two additional payments in February and March 2018, but those payments were returned because of insufficient funds in his bank account. After March 24, 2018, he neither made nor tried to make another Loan payment. Under the Loan's terms, failure to make a timely pay was an event of default. The court thus concludes plaintiff is in breach of the Loan Agreement.

### e.   Barclays has Sustained Damages Because of Plaintiff's Breach

Barclays asserts that it has sustained not less than $5,629.33 in damages, and that those damages continue to accrue as plaintiff withholds payments and drives litigation costs. Doc. 158 at 55–56. Barclays also notes that it has expended significant attorneys' fees and costs trying to collect the outstanding Loan balance. *Id.* The terms of the Loan Agreement provide that Barclays may recover "reasonable attorneys' fees, court or other collection costs" if it must

collect on the Loan because of default.  Concluding that Barclays has sustained damages because of plaintiff's breach of the Loan agreement, the court grants summary judgment in Barclays's favor on its breach of contract claim.  *See Hefner v. Deutscher*, 464 P.3d 367, 380 (Kan. Ct. App. 2020) (court may properly grant summary judgment in party's favor on breach of contract claim when all material facts are undisputed).  The undisputed facts in the summary judgment record establish no genuine dispute whether the parties had a valid contract, supported by consideration, that plaintiff breached that contract, and thus caused defendant to incur damages.  The court awards Barclays $5,6293.33 in damages, plus interest, and the reasonable attorneys' fees and costs it has expended collecting on the Loan.

### D.  Plaintiff's Motion for Leave to File Surreply (Doc. 183)

Plaintiff has filed a Motion for Leave to File Surreply (Doc. 183).  Plaintiff asserts that the arguments in Barclays's Reply supporting its Motion for Summary Judgment "sets forth new evidence and proposes a new remedy . . . ."  Doc. 183 at 2.  Specifically, plaintiff seeks leave to file a surreply to address Barclays's breach of contract Counterclaim.  Doc. 183-1 at 1–2.  He asserts that a surreply is warranted for two reasons:  (1) plaintiff didn't know the elements of Barclays's breach of contract Counterclaim, and (2) Barclays failed to assert its Counterclaim in its Answer to his Second Amended Complaint because it merely incorporated its counterclaim by reference in a footnote.  *Id.* at 2.

Our court's local rules limit briefing on motions to the motion (with memorandum in support), a response, and a reply.  D. Kan. Rule 7.1(a) & (c).  "Surreplies are typically not allowed."  *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 Fed. App'x 752 (10th Cir. 2006).  Instead, surreplies are permitted only with leave of court under "rare circumstances."  *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL

982903, at *1 (D. Kan. Sept. 23, 1998) (citations omitted).  For example, when a moving party

raises new material for the first time in a reply, the district court has discretion to grant leave to

file a surreply to afford the opposing party an opportunity to respond to the new material (which

includes both new evidence and new legal arguments).  *Green v. New Mexico*, 420 F.3d 1189,

1196 (10th Cir. 2005) (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13

(10th Cir. 2003)).  The rules governing surreplies "are not only fair and reasonable, but they

assist the court in defining when briefed matters are finally submitted and in minimizing the

battles over which side should have the last word."  *Humphries*, 1998 WL 982903, at *1.

Barclays opposes plaintiff's surreply motion.  Doc. 185.  It asserts that its Reply does not

raise any new material, arguments, or evidence.  *Id.* at 2.  Indeed, Barclays explicitly listed the

elements of its breach of contract Counterclaim in its Memorandum in Support of its Motion for

Summary Judgment.  Doc. 158 at 53.  So, plaintiff had every opportunity to respond to

Barclays's argument in his Opposition.  And, Barclays contends, its argument in its Reply that its

Counterclaim still is pending was in response to plaintiff's Opposition, which asserted that

Barclays had no pending counterclaim.  Doc. 185 at 3.  The court agrees.  Barclays raised no new

arguments or claims in its Reply.  Its arguments were well within the scope of argument

permitted in a reply brief.  The court thus denies plaintiff's Motion for Leave to File Surreply

(Doc. 183).  *See Hall v. Whitacre*, No. 06-1240-JTM, 2007 WL 1585960, at *1 (D. Kan. May 31,

2007) (explaining that "[w]hile the court accords deference to pro se litigants," there is no

justification for excusing strict rule against surreplies where it merely would provide "additional

and longer arguments, which also could have been submitted in the first response"); *EEOC v.

Int'l Paper Co.*, Civ. A. No. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992) ("The

44

paper exchanges between parties must have an end point and cannot be permitted to become self perpetuating.").

### E.  Summary

To summarize the rulings in the disputes between plaintiff and Barclays, first, the court grants summary judgment against plaintiff's FCRA claim because the undisputed facts in the summary judgment record show that (1) Barclays furnished accurate information to CRAs about plaintiff's account, and (2) Barclays conducted reasonable investigations into each of the dispute notices it received from CRAs.  Next, the court grants summary judgment against plaintiff's punitive damages claim because plaintiff has failed to adduce evidence supporting a triable issue whether Barclays "willfully" violated the FCRA.  Finally, the court grants summary judgment in Barclays's favor in its breach of contract Counterclaim because the summary judgment record shows that the parties had a valid contract and that plaintiff breached that contract when he defaulted on his Loan agreement.  The court also denies plaintiff's Motion for Leave to File Surreply (Doc. 183).

### IV.  Marketplace's Motion for Summary Judgment (Doc. 203)

The Complaint alleges violations of the Telephone Consumer Protection Act "TCPA" (Count II) and the Fair Debt Collection Practices Act ("FDCPA") (Count VII) against defendant Marketplace.  Doc. 141 at 11–13, 23 (Second Am. Compl. ¶¶ 42–48, 88–90).  The Complaint alleges, in essence, that Marketplace (1) violated the TCPA by using an automatic telephone dialing system, and (2) violated the FDCPA by continuing to contact him after he demanded they stop.  Marketplace has moved for summary judgment against both claims.  Doc. 203.  Below, the court begins by reciting the uncontroverted facts, and then considers Marketplace's summary judgment arguments against (1) plaintiff's TCPA claim, and (2) plaintiff's FDCPA claim.

### A. Statement of Uncontroverted Facts

Marketplace is a Delaware Statutory Trust.  Doc. 141 at 4 (Second Am. Compl. ¶ 13).
Marketplace hired First Associates Loan Servicing, LLC ("First Associates") to service
plaintiff's debt.  Doc. 204-1 at 1 (Cantrell Decl. ¶ 3).  "First Associates uses a cloud-based
calling system from Five9 (the 'Calling System')."  *Id.* (Cantrell Decl. ¶ 4).  The Calling System
does not use a random or sequential number generator, nor does it have the capacity to do so.  *Id.*
(Cantrell Decl. ¶ 5).  Instead, the Calling System uses lists of phone numbers generated from
customer records.  *Id.* at 1–2 (Cantrell Decl. ¶ 6).  These phone numbers are, most often,
contained in spreadsheets and uploaded to the Calling System.  *Id.*  "The Calling System does
not use recorded messages or artificial voices in outbound calls."  *Id.* at 2 (Cantrell Decl. ¶ 7).
Customers who call First Associates always talk with a live representative.  *Id.*  Every message
First Associates left for plaintiff was a voice message left by a person, speaking live, as a
representative of First Associates.  *Id.* (Cantrell Decl. ¶ 8).

### B. Analysis

The court considers plaintiff's TCPA and FDCPA claims, in turn, below.  And for
reasons explained below, the court grants summary judgment against both claims.

#### 1. Plaintiff's TCPA Claim

The Complaint alleges Marketplace violated the TCPA by using an automatic telephone
dialing system to call plaintiff's cellular phone without his consent.  Doc. 141 at 11–13 (Second
Am. Compl. ¶¶ 42–48).  Because the Tenth Circuit hasn't decided whether devices that
exclusively dial numbers stored in a customer database qualify as automatic telephone dialing
systems, the court first explains how the Third, Seventh, Ninth, and Eleventh Circuits have

decided this question.  The court then predicts the result the Tenth Circuit would reach if it decided this question.  And, finally, the court applies that standard to plaintiff's claim.

### a.   The Automatic Telephone Dialing System Circuit Split

The TCPA—subject to certain exceptions—prohibits calling a cellular phone using an automated telephone dialing system ("ATDS" or "autodialer").  47 U.S.C. § 227(b)(1)(A)(iii).  It also charges the FCC with promulgating regulations implementing the Act's requirements.  *Id.* § 227(b)(2).  The TCPA defines an ATDS or autodialer as "equipment which has the capacity— (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers."  *Id.* § 227(a).  This "awkward statutory wording," poses a "difficult question," *i.e.*, whether systems that only dial telephone numbers stored in a customer database qualify as autodialers.  *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 460–61 (7th Cir. 2020).

Before considering the authority on this question, some historical context is helpful. When Congress enacted the TCPA in 1991, "telemarketers primarily used [calling] systems that randomly generated numbers and dialed them . . . ."  *Id.* at 461.  These sorts of devices always qualified as autodialers.  *Id.*  Indeed, after Congress enacted the TCPA, courts interpreted the statute to cover "devices that randomly or sequentially generated telephone numbers and dialed those numbers, or stored them for later dialing."  *Glasser v. Hilton Grand Vacations Co., LLC*, 948 F.3d 1301, 1307 (11th Cir. 2020).  The FCC's early regulations comported with this interpretation.  In a 1992 declaratory order, the FCC "explained that certain technologies would not qualify as auto-dialers under the Act because the numbers these devices called 'are not generated in a random or sequential fashion'—a baseline for all covered calls."  *Id.* at 1308 (quoting *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 7 FCC

Rcd. 8572, 8776 (1992)).  The FCC maintained this approach in 1995, "saying [then] that it did

not cover calls 'directed to . . . specifically programmed contact numbers,' only to those

'randomly or sequentially generated telephone numbers.'"  *Id.* (quoting *In re Rules &*

*Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12400

(1995)).

Later, in 2003, and responding to new telemarketing technology and strategies—*i.e.*,

"predictive dialers" that called lists of predetermined potential customers—the FCC issued a new

order extending the TCPA.  This order interpreted the definition of autodialers "to extend to

equipment that merely dialed numbers 'from a database of numbers'—that merely stored

numbers and called them."  *Id.* (quoting *In re Rules & Regulations Implementing the Tel.*

*Consumer Prot. Act of 1991*, 18 FCC Rcd. 14014, 14091 (2003)).  In 2015, the FCC issued

another Order intended to clarify which devices qualify as autodialers.  *Id.* at 1309.  In this 2015

Order, the FCC explained that (1) a device's "capacity" means its "'potential functionalities'

with modifications such as software changes," and (2) predictive dialers qualify as autodialers.

*ACA Int'l v. Fed. Commc'ns Comm.*, 885 F.3d 687, 693–94 (D.C. Cir. 2018) (quoting *In re Rules*

*& Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7974

(2015)).

But the Circuit for the District of Columbia vacated the FCC's Order in *ACA*

*International*.  On the first point—*i.e.*, the definition of "capacity,"—the D.C. Circuit concluded

that the agency's definition was far too expansive.  *Id.* at 701.  Because any smartphone user

easily could download an autodialer application, "any smartphone . . . can gain the statutorily

enumerated features of an autodialer and thus function as an ATDS."  *Id.* at 696.  In other words,

"*any* uninvited call or message from the device is a statutory violation," exposing the caller to a

48

minimum $500 penalty as damages.  *Id.* at 697.  On the second point—*i.e.*, that predictive dialers qualify as autodialers—the D.C. Circuit concluded that the FCC had advanced competing interpretations about which devices qualify.  *Id.* at 703.  The FCC's 2015 ruling "indicate[d] in certain places that a device must be able to generate and dial random or sequential numbers to meet the TCPA's definition of an autodialer," but "also suggest[ed] a competing view:  that equipment can meet the statutory definition even if it lacks that capacity."  *Id.* at 702.  The lack of clarity about which devices qualify as autodialers, compounded by the FCC's expansive definition of "capacity," prompted the D.C. Circuit to "set aside" the FCC's "treatment of those matters."  *Id.* at 703.

This outcome left it to the courts to "interpret the statute's text as though for the first time."[6]  *Gadelhak*, 950 F.3d at 463; *see also Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049 (9th Cir. 2018) ("Because the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, only the statutory definition of ATDS as set forth by Congress in 1991 remains.").  Four circuits have considered the question whether a device that dials numbers from a stored list qualifies as an autodialer.  Our Circuit is not one of them.  Three circuits—the Third, Seventh, and Eleventh—have held that a device that "exclusively dials numbers stored in a customer database" does not qualify as an autodialer.  *Gadelhak*, 950 F.3d at 460; *Glasser*, 948 F.3d at 1306 (holding that statute doesn't apply to calling system that targeted list of debtors); *Dominguez*, 894 F.3d at 121 (affirming summary judgment because plaintiff had adduced no evidence that defendant's system "had the present capacity to function as an autodialer by

---

[6]      As explained later in this section, the Third Circuit did not take this approach.  Instead, it interpreted *ACA International* to require the court to set aside only the FCC's 2015 Order.  *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018).  This approach means the Third Circuit interpreted the statutory definition of an autodialer as it had before the 2015 Order, but not as if it was interpreting the definition for the first time.

generating random or sequential numbers and dialing those numbers").  The Ninth Circuit, however, reached a different conclusion.  It held that evidence that a system that stores phone numbers and dials them automatically presents a genuine issue of material fact whether that system meets the definition for an autodialer.  *Marks*, 904 F.3d at 1053.

The perplexing language of the statute has produced this split of authority.  What is "equipment which has the capacity—(A) to store or produce telephone numbers to be called; and (B) to dial such numbers"?  § 227(a)(1); *see Gadelhak*, 950 F.3d at 460 ("The wording of the provision that we interpret today is enough to make any grammarian throw down her pen."); *Glasser*, 948 F.3d at 1306 ("Clarity, we lament, does not leap off this page of the U.S. Code."); *Marks*, 904 F.3d at 1051 ("After struggling with the statutory language ourselves, we conclude that it is not susceptible to a straightforward interpretation based on the plain language alone. Rather, the statutory text is ambiguous on its face.").

*Glasser* explained that the first question is whether the clause "using a random or sequential number generator" modifies both verbs ("store" and "produce")?  948 F.3d at 1306.  Or, instead, does it just modify the second verb ("produce")?  *Id.*  If it modifies both verbs, then "to be an autodialer, the equipment must (1) store telephone numbers using a random or sequential number generator and dial them, and (2) produce such numbers using a random or sequential number generator and dial them."  *Id.*  Under this interpretation, calling systems targeting a list of debtors do not qualify as autodialers.  *Id.*  But if the phrase "using a random or sequential number generator" merely modifies the second verb—"produce"—then, the equipment, to be an autodialer, must "(1) store telephone numbers and dial them or (2) produce such numbers using a random or sequential number generator and dial them."  *Id.*  Under this

interpretation, the statute extends to calling systems targeting a pre-existing list of debtors, even though they were not randomly or sequentially identified.  *Id.*

Acknowledging that neither option was ideal, the Eleventh Circuit chose the first option—*i.e.*, the clause modifies both verbs.  *Id.*  And it excludes equipment that exclusively dials numbers stored in a customer database from the definition of "autodialer."  *Id.  Glasser* reasoned that, under conventional rules of grammar and punctuation, "[w]hen two conjoined verbs ('to store or produce') share a direct object ('telephone numbers to be called'), a modifier following that object ('using a random or sequential number generator') customarily modifies both verbs."  *Id.*  For example, in the sentence "[a]ppellate courts reverse or affirm district court decisions using the precedents at hand," the modifier ("precedents at hand") applies to both verbs ("reverse" and "affirm").  *Id.* (internal quotation marks omitted).  That is, "[n]o one would think that appellate judges rely on precedents only when affirming trial judges."  *Id.*  Also, the opinion explained, the statute has a comma separating the phrases "to store or produce telephone numbers to be called" and "using a random or sequential number generator."  *Id.* at 1307.  This structure indicates that the modifier applies to both verbs.  *Id.* (citing Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 150 (2012) (further citations omitted)).

But this interpretation doesn't lack its own flaws—or "hiccups"—as the Eleventh Circuit phrased it.  *Id.*  "The first hiccup is the oddity of 'stor[ing]' telephone numbers using a number generator."  *Id.*  But this flaw isn't fatal, *Glasser* explains, because "[s]omewhere between identification and production, storage occurs."  *Id.*  So, "a device 'stores' telephone numbers 'using' a random or sequential number generator because the device employs the number generator as part of the storage process."  *Id.*  This interpretation, however, reveals the second flaw of this interpretation:  superfluity.  Namely, "if a device that produces telephone numbers

51

*necessarily* stores" those numbers, then the words "to store" are superfluous.  *Id.*  But, *Glasser* explains, the alternative interpretation reads a key clause—"using a random or sequential number generator"—out of the statute.  *Id.*  In sum, *Glasser* concludes, the statute's language supports— albeit not perfectly—the conclusion that the phrase "using a random or sequential number generator" modifies both "store" and "produce."

Next, *Glasser* notes, the kinds of devices that existed when Congress passed the statute supports the first interpretation.  *Id.*  When Congress enacted the TCPA, "devices existed that could randomly or sequentially create telephone numbers and (1) make them available for immediate dialing or (2) make them available for later dialing."  *Id.*  Sometimes storage occurred and sometimes it didn't, so the statute "occupied the waterfront, covering devices that randomly or sequentially generated telephone numbers and dialed those numbers, or stored them for later dialing."  *Id.*  And, *Glasser* explains, context supports the first interpretation.  Section 227(b)(1) prohibits using autodialers "to call 'any emergency telephone line,' including 'any "911" line.'"  *Id.* at 1308 (quoting 47 U.S.C. § 227(b)(1)(A)(i)).  Congress passed this law to prevent callers from accidentally dialing 911 using randomly or sequentially generated telephone numbers.  *Id.* (citing *Computerized Telephone Sales Calls & 900 Service:  Hearing Before the Senate Comm. on Commerce, Science, and Transp.*, 102d Congress 34–35 (1991) (Statement of Chuck Whitehead)).  In other words, Congress was concerned about random or sequential numbers generates producing calls to 911 emergency lines, not about callers targeting a list of customers.

Finally, the second interpretation permits the same sweep that *ACA International* concluded was too broad.  *Id.* at 1309.  That is, *ACA International*'s concern about the FCC's broad definition of "capacity" also applies to the definition of an autodialer's functions.  *Id.*  "In the age of smartphones, it's hard to think of a phone that does not have the capacity to

automatically dial telephone numbers stored in a list, giving § 227 an 'eye-popping' sweep." *Id.*
at 1309 (quoting *ACA Int'l*, 885 F.3d at 697).  Surely, *Glasser* concludes, every unsolicited call
using voice activated software or automated text message does not produce a $500 statutory
violation.  *Id.*  In sum, *Glasser* held, to qualify as an autodialer, "equipment must (1) store
telephone numbers using a random or sequential number generator and dial them or (2) produce
such numbers using a random or sequential number generator and dial them." *Id.* at 1306.  This
definition excludes the equipment used in debt collection calls that exclusively targets a list of
debtors.  *Id.*

The Seventh Circuit reached the same conclusion in *Gadelhak*, 950 F.3d at 468.  It agreed
with the Eleventh Circuit that the best textual interpretation of the statute, although imperfect, is
that the phrase "using a random or sequential number generator" modifies both "store" and
"produce." *Id.*  It quoted *Glasser*'s assessment of the statute's language, and agreed the
"interpretation is certainly the most natural one based on sentence construction and grammar."
*Id.* at 464.  As for the superfluity problem, *Gadelhak* reasoned that "surplusage is not a deal-
breaker," and that "it is plausible that Congress chose some redundancy to cover 'the
waterfront.'" *Id.* at 465 (quoting *Glasser*, 948 F.3d at 1307).

Like the Eleventh Circuit, the Seventh Circuit explained why it rejected the interpretation
that applies the clause "using a random or sequential number generator" just to the second verb,
"produce." *Id.* at 466.  The advantage of this interpretation, *Gadelhak* acknowledges, is that it
eliminates the problem that it makes little sense that a "random or sequential number generator"
would "store" numbers. *Id.*  But its "fatal flaw," is that it "requires us to contort the statutory
text almost beyond recognition." *Id.*  *Gadelhak* reasons that there's no dispute that "telephone
numbers to be called" modifies both "store" and "produce." *Id.*  So, this interpretation requires

the court "to splice 'store' and 'produce' to have the final phrase, 'using a random or sequential number generator'" modify just the verb "produce." *Id.* For this interpretation to make sense, *Gadelhak* explains, the court would have "to reorder the sentence to separate "store" and "produce," while clarifying that "telephone numbers is the object of both." *Id.* And this sort of "significant judicial rewrite" cuts against this interpretation. *Id.* Finally, *Gadelhak* notes, *Glasser*'s interpretation makes sense because if "using a random or sequential number generator" merely modifies "to produce," then "it would create liability for every text message sent from an iPhone." And this kind of "sweeping restriction on private consumer conduct that is inconsistent with the statute's narrower focus." *Id.* at 467.

The Third Circuit reached the same conclusion, but for a different reason in *Dominguez*, 894 F.3d at 121. The Third Circuit decided *Dominguez* shortly after *ACA International*, and before *Glasser* or *Gadelhak*. There, the Third Circuit concluded that *ACA International* required it to interpret the statutory definition of an autodialer as it had before the FCC's 2015 Order. *Id.* at 119. In other words, *Glasser* and *Gadelhak* set aside completely the FCC's treatment of § 227(a), while *Dominguez* merely set aside the 2015 Order. *Dominguez* thus did not consider the grammar of the statute or the other factors discussed in *Glasser* and *Gadelhak*. The only pertinent question in *Dominguez* was whether the plaintiff had adduced sufficient evidence to show that the calling device at issue "had the present capacity to function as an autodialer by generating random or sequential telephone numbers and dialing those numbers." *Id.* Concluding that the summary judgment record presented no genuine issue of material fact on that question, the court affirmed the district court's decision granting summary judgment. *Id.* at 121.

This leaves the Ninth Circuit's decision in *Marks*. Consistent with *Glasser* and *Gadelhak*, *Marks* began with the premise that because the D.C. Circuit had vacated the FCC's

interpretation of what sort of devices qualify as autodialers, just the statutory definition remained.  949 F.3d at 1049.  And because the statutory text was "ambiguous on its face," it turned to the "context and structure of the statutory scheme" to resolve the question.  *Id.* at 1051.

The Ninth Circuit concluded that "the statutory definition of ATDS is not limited to devices with the capacity to call numbers produced by a 'random or sequential number generator,' but also includes devices with the capacity to dial stored numbers automatically."[7] *Id.* at 1052.  First, the *Marks* opinion explained that "language in the statute indicates that equipment that made automatic calls from lists of recipients was also covered by the TCPA."  *Id.* at 1051.  For instance, certain TCPA provisions exempt some phone calls from the statute's coverage.  *Id.* (citing § 227(b)(1)(A), which permits use of autodialers to call a phone number "with the prior express consent of the called party").  *Id.*  And after the FCC issued its 2015 Order, Congress amended the TCPA, exempting the use of autodialers "to make calls 'solely to collect a debt owed to or guaranteed by the United States.'"  *Id.* (quoting § 227(b)(1)(A)(iii)).  *Marks* explained that "[l]ike the exception allowing the use of an autodialer to make calls 'with the prior express consent of the called party,' this debt collection exception demonstrates that equipment that dials from a list of individuals who owe a debt to the United States is still an ATDS but is exempted from the TCPA's strictures."  *Id.* at 1052.  In sum, if an ATDS merely covers devices that randomly or sequentially generate numbers, it doesn't make sense to exempt

---

[7]     The dissenting opinion in *Glasser* agreed with the approach used in *Marks*.  It reasoned that the second interpretation—*i.e.*, the interpretation that applies the phrase "using a random or sequential number generator" just to the verb "produce"—is the better alternative because it "avoids surplusage, harmonizes the challenged language with other aspects of the TCPA, and aligns with the Ninth Circuit's approach in *Marks*."  948 F.3d at 1315 (Martin, J., concurring in part and dissenting in part).  So, while *Marks*'s view has not prevailed outside the Ninth Circuit, it has collected some traction in at least one other Circuit.

consented-to calls or calls collecting on debt owed to the federal government because nobody would use an autodialer to make those calls.

Second, *Marks* notes, when Congress amended this section of the TCPA, it "left the definition of ATDS untouched, even though the FCC's prior orders interpreted this definition to include devices that could dial numbers from a stored list." *Id.* Because Congress knew the existing statutory definition of an ATDS when it amended the statute, *Marks* explained, Congress "gave the interpretation its tacit approval." *Id.* (citing *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)). This result means that, in the Ninth Circuit, "the statutory definition of ATDS includes a device that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator." *Id.* at 1043.

### b. Discussion

Because our Circuit hasn't decided whether devices with the capacity to automatically dial stored numbers qualify as autodialers, the court must predict how it would decide this question. *See Yang v. Midland Credit Mgmt., Inc.*, No. 15-2686-JAR, 2016 WL 393726, at *3 (D. Kan. Feb. 2, 2016) (predicting how Tenth Circuit would decide question that had produced split of authority). After considering the approaches other Circuits have taken, the court predicts our Circuit would take the same approach as the Seventh and Eleventh Circuits in *Gadelhak* and *Glasser*. These cases held that devices that exclusively dial numbers stored in a customer database do not qualify as autodialers for purposes of the TCPA. *Glasser*, 948 F.3d at 1306; *Gadelhak*, 950 F.3d at 460.

The court reaches this conclusion for several reasons. *First*, both decisions exhaustively analyze the statute's text. *See Glasser*, 948 F.3d at 1306–07; *Gadelhak*, 950 F.3d at 463–66. And both reached the same conclusion:  the phrase "using a random or sequential number

generator" modifies both "store" and "produce." *Glasser*, 948 F.3d at 1306–07; *Gadelhak*, 950 F.3d at 460.  Producing numbers by using a random or sequential number generator excludes devices that "exclusively dial[ ] numbers stored in a customer database" from the definition of an autodialer.  *Gadelhak*, 950 F.3d at 460.  *Marks*, on the other hand, didn't reach a conclusion about the statutory language because of its ambiguity.  904 F.3d at 1050–51.  Instead, it relied on "the context and structure of the statutory scheme."  *Id.* at 1051.  The court predicts that the Tenth Circuit, consistent with *Glasser* and *Gadelhak*, would begin its analysis with the statute's text.  *See Woods v. Standard Ins. Co.*, 771 F.3d 1257, 1263 (10th Cir. 2014) (explaining that in statutory interpretation, the court's interpretation "must begin" with the statute's plain language); *see also United States v. Rentz*, 777 F.3d 1105, 1109 (10th Cir. 2015) (acknowledging that "in the business of statutory interpretation, [the court] do[es] not always bow to linguistic rules," "[b]ut until a clue emerges suggesting otherwise, it's not unreasonable to think that Congress used the English language according to its conventions").

    *Second*, *Glasser* and *Gadelhak* persuasively explain why *Marks*'s discussion about the TCPA exemptions doesn't carry the day.  That is, why would the statute exempt from liability calls to consenting recipients or calls about debts owed to the federal government if the statute covers just randomly or sequentially generated numbers?  *Glasser*, 948 F.3d at 1312; *Gadelhak*, 950 F.3d at 466–67.  *Glasser* explains § 227(b)(1) "makes callers liable if they make calls 'using an automatic telephone dialing system *or an artificial or prerecorded voice*.'"  948 F.3d at 1311.  So, *Glasser* reasons, the alternative basis for liability—using "an artificial or prerecorded voice"—explains the exemptions.  *Id.* at 1312.  And *Glasser* notes that the TCPA covers devices that have the "capacity" to generate numbers randomly or sequentially; "it does not require that capacity to be used in every covered call."  948 F.3d at 1312.  In other words, the statute

prohibits devices with the *capacity* to dial random or sequential numbers, even though that same device also potentially could be used to call phone numbers stored in a database.

*Third*, *Glasser* notes that the legislative history supports its preferred interpretation. 948 F.3d at 1311. "[T]here is plenty of evidence Congress wanted the statute to eradicate machines that dialed randomly or sequentially generated numbers." *Id.* (citing *H.R. 1304 & 1305, Hearing Before the Subcomm. on Telecomms. & Fin. of the H. Comm. on Energy & Commerce*, 102d Cong. 1 (1991) (Statement of Chairman Edward J. Markey). *Marks* never discusses the statute's legislative history in this context.

*Fourth*, the argument that Congress declined to amend the statute in 2015—after the FCC's 2015 Order—implied tacit approval of the FCC's Order doesn't carry the day, either, because "'[c]ongressional failure to act does not necessarily reflect approval of the status quo.'" *Gadelhak*, 950 F.3d at 467 (quoting *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001)). That proposition applies here, *Gadelhak* notes, because when Congress amended the TCPA in 2015, the FCC's interpretation of the law wasn't settled. *Id.* Instead, the D.C. Circuit already was reviewing *ACA International*. *Id.* On balance, the court finds *Glasser* and *Gadelhak* more persuasive, and predicts that the Tenth Circuit would adopt the same approach.

This outcome informs the result here because to prevail on a TCPA claim, plaintiff must adduce evidence that (1) Marketplace called plaintiff's cellular telephone, (2) using an ATDS, (3) without plaintiff's prior consent. *Lee v. loanDepot.com, LLC*, No. 14-1084-EFM, 2017 WL 590263, at *2 (D. Kan. Feb. 14, 2017) (first citing 47 U.S.C. § 227(b)(1); and then citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

Marketplace asserts that it is entitled to summary judgment against plaintiff's TCPA claim because the Calling System is not an ATDS. Doc. 204 at 5. It asserts that the summary

judgment facts show that the Calling System does not use a random or sequential number generator, nor does it have the capacity to do so. Instead, it uses lists of phone numbers generated from customer records. So, Marketplace reasons, the Calling System is not an ATDS. *See Glasser*, 948 F.3d at 1306 (holding that the "better option" is that the phrase "using a random or sequential number generator" modifies both verbs, so devices that call phone numbers from a database of existing phone numbers do not qualify as autodialers); *Gadelhak*, 950 F.3d at 460 (holding that a system that exclusively dials numbers stored in a customer database is not an autodialer).

Plaintiff's Opposition contends that the Calling System qualifies as an ATDS. Doc. 206 at 6. He cites several cases to support his argument. He first cites *Morgan v. On Deck Capital, Inc.*, No. 3:17-CV-00045, 2019 WL 4093754 (W.D. Va. Aug. 29, 2019). In *Morgan*, the sole summary judgment issue was whether plaintiff had adduced sufficient evidence to support a finding that the calling system at issue was capable of automatic dialing. *Id.* at *5. After considering the summary judgment record, the court denied summary judgment because there was a genuine dispute of fact about the question. *Id.* at *7. That outcome doesn't help plaintiff's claim survive summary judgment here, though, because plaintiff has adduced no evidence that the Calling System here was capable of functioning as an autodialer. *See McKinzy*, 367 F. App'x at 897 (affirming summary judgment against a pro se plaintiff who alleged generally that disputed issues of material fact precluded summary judgment but failed to identify any part of the record to support his claim). Plaintiff's Opposition also cites *Marks*, and several district court cases that, he asserts, follow *Marks*'s holding. Doc. 206 at 3–5. *Marks* certainly presents one viable interpretation of the definition of an ATDS, but the court already has concluded that the approach in *Gadelhak* and *Glasser* have the better of the question.

In sum, the court agrees with Marketplace.  The uncontroverted summary judgment facts show that the Calling System exclusively used phone numbers taken from a database of customers and thus lacked the capacity to function as an ATDS.  Predicting that the Tenth Circuit—consistent with the Seventh and Eleventh Circuits—would adopt a definition of an ATDS that excludes this kind of device, the court grants Marketplace summary judgment against plaintiff's TCPA claim.[8]

## 2.  Plaintiff's FDCPA Claim

Last, the court addresses plaintiff's FDCPA claim against Marketplace (Doc. 141 at 23 (Second Am. Compl. ¶¶88–90)).  Marketplace argues that the Complaint fails to state a plausible claim for relief.  Doc. 204 at 14–15.  Rule 12(b)(6) requires a party to file a motion asserting a failure to state a claim defense "before pleading if a responsive pleading is allowed."  Fed. R. Civ. P. 12(b)(6).  Since Marketplace moves to dismiss plaintiff's FDCPA claim in a summary judgment motion after filing its Answer, the court construes its motion as one made under Rule 12(c) for judgment on the pleadings.  *See* Fed. R. Civ. P. 12(c) ("After the pleadings are closed— but early enough not to delay trial—a party may move for judgment on the pleadings."); *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002) (explaining that when a defendant moves to dismiss for failure to state a claim after filing the answer, "the motion should generally be treated as a motion for judgment on the pleadings").  Courts evaluate a Rule 12(c) motion under the same standard governing a Rule 12(b)(6) motion to dismiss.  *Jacobsen*, 287 F.3d at 941 n.2 (noting that the court's "decision would be the same whether considered as a 12(b)(6) motion or a 12(c) motion").  The court's analysis thus begins with the standard for

---

[8]      Marketplace requests oral argument on its motion.  Doc. 207 at 8 (citing D. Kan. Rule 7.2). Having reviewed the parties' written submissions, and concluding summary judgment is appropriate, the court declines to set the motion for oral argument.

stating a plausible FDCPA claim.  The court then considers whether the Complaint alleges a plausible claim for relief.

Congress enacted the FDCPA "'to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses.'"  *Marx v. Gen. Revenue Corp.*, 668 F.3d 1174, 1177 (10th Cir. 2011) (quoting 15 U.S.C. § 1692(e)).  With three exceptions defined in the FDCPA, § 1692c(c) prohibits a "debt collector" from communicating with a "consumer with respect to [a] debt" after the consumer "notifies [the] debt collector in writing that . . . the consumer wishes the debt collector to cease further communication with him."  15 U.S.C. § 1692c(c).  The Complaint alleges that Marketplace violated the FDCPA because it "fail[ed] to discontinue communications with [p]laintiff after notice to discontinue."  Doc. 141 at 23 (Second Am. Compl. ¶ 89).

The FDCPA defines "consumer" as "any natural person obligated or allegedly obligated to pay" a debt.  15 U.S.C. § 1692a(3).  The statute defines "debt" as an obligation of a consumer "to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  *Id.* § 1692a(5).  And the FDCPA defines "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  *Id.* § 1692a(6).  Thus, to state a plausible FDCPA claim, plaintiff must allege that "'(1) [he] is a "consumer" within the meaning of 15 U.S.C. § 1692a(3); (2) the debt at issue arises out of a transaction entered into primarily for personal, family, or household purposes [as required by § 1692a(5)]; (3) Defendant

is a "debt collector" within the meaning of 15 U.S.C. § 1692a(6); and (4) Defendant, through its

acts or omissions, violated a provision of the FDCPA.'"  *Eliker v. Nelnet*, No. 17-01208-EFM-

GEB, 2018 WL 1566644, at *2 (D. Kan. Mar. 30, 2018) (quoting *Yang v. Midland Credit Mgmt.

Inc.*, No. 15-2686-JAR, 2016 WL 393726, at *1 (D. Kan. Feb. 2, 2016)).

   Marketplace asserts that plaintiff's Complaint never alleges that plaintiff is a consumer or

that Marketplace is a debt collector.  Doc. 204 at 15.  Nor, Marketplace notes, does the

Complaint assert that the debt at issue arose from a transaction entered into for personal, family,

or household purposes.  *Id.*  Plaintiff responds that he adequately has stated a claim under the

FDCPA, and that Marketplace has misapprehended the court's prior Order dismissing plaintiff's

FDCPA claim against another defendant.  Doc. 206 at 6.

   The court agrees with Marketplace.  As the court explained in its earlier Order, plaintiff's

Complaint never alleges that he qualifies as a consumer under the FDCPA.  *See* Doc. 181 at 23

(dismissing FDCPA claim against another defendant under Fed. R. Civ. P. 12(b)(6) because

plaintiff failed to state a plausible claim under the FDCPA).  Plaintiff never alleges that

Marketplace is a debt collector as the FDCPA defines that term.  And plaintiff never alleges facts

capable of supporting a plausible inference that the debt at issue arose from a transaction entered

into for personal, family, or household purposes.  Plaintiff thus has failed to state a plausible

claim under the FCDPA.  The court grants judgment on the pleadings against plaintiff's FDCPA

claim.

### C.  Summary

The court grants summary judgment against plaintiff's TCPA claim and grants judgment on the pleadings against plaintiff's FDCPA claims. The court predicts that the Tenth Circuit would exclude from the definition of an ATDS devices that exclusively call phone numbers from a database of customers. And because plaintiff has adduced no evidence that Marketplace's Calling System was capable of calling numbers using a random or sequential number generator, the court grants summary judgment against plaintiff's TCPA claim. Finally, the court grants judgment on the pleadings against plaintiff's FDCPA claim because the Complaint fails to state a claim for which the court can grant relief.

## V.   Conclusion

*First*, Barclays's Motion for Summary Judgment (Doc. 157) is granted. The court grants summary judgment against plaintiff's FCRA claim and grants summary judgment in Barclays's favor on its counterclaim. The court enters judgment against plaintiff in the amount of $5,629.33, plus interest, and reasonable attorneys' fees and costs. *Second*, the court denies plaintiff's Motion for Leave to File Surreply (Doc. 183). *Third*, Marketplace's Motion for Summary Judgment (Doc. 203) is granted.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Barclays Bank Delaware's Motion for Summary Judgment (Doc. 157) is granted.

**IT IS FURTHER ORDERED THAT** judgment against plaintiff is entered in favor of Barclays on its counterclaim. The court directs the Clerk of the Court to enter a judgment of $5,629.33, plus interest, and reasonable attorneys' fees and costs in Barclays's favor and against plaintiff.

**IT IS FURTHER ORDERED THAT** plaintiff's Motion to File a Sur-reply (Doc. 183) is denied.

**IT IS FURTHER ORDERED THAT** defendant Marketplace Loan Grantor Trust's Motion for Summary Judgment (Doc. 203) is granted.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to terminate defendants Barclays Bank Delaware, Marketplace Loan Grantor Trust, and Does 1-10 from this action.

**IT IS FURTHER ORDERED THAT** the court directs the Clerk of the Court to enter a judgment consistent with this Order and close this case.

**IT IS SO ORDERED.**

**Dated this 13th day of August, 2020 at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**